William VAN DYKE, Plaintiff and Appellant,

v.

KUTV, a Utah Corporation, Defendant and Respondent.

No. 17759.

Supreme Court of Utah.

March 29, 1983.

Richard W. Campbell, Ogden, for plaintiff and appellant.

David Jordan, Dale J. Lambert, Salt Lake City, for defendant and respondent.

HOWE, Justice:

This is an appeal from a judgment in a defamation action in which plaintiff alleged

libel in a television broadcast aired by defendant. The jury returned a special verdict finding that the broadcast was false in one or more material respects, but that the defendant did not act with malice. Judgment was entered in favor of the defendant and plaintiff seeks reversal and retrial.

Plaintiff William Van Dyke (Van Dyke) was Director of Financial Aids of Weber State College in Ogden, Utah from October 1, 1966 to March 25, 1980. In that position he had direct responsibility of federal student aid programs and institution scholarships. He regulated distribution of funds; reconciled accounts and records with state and federal auditors; regulated programs to comply with federal regulations; made applications for federal grants; supervised office personnel; interviewed applicants to determine program eligibility; counseled students in financial matters; supervised student payroll, grants and loans; acted as chairman of scholarship committee; issued scholarship certificates and kept controls/records; and he assisted students in need of counsel or financial advice. His salary was paid by the state. He supervised an office of four other financial aid officers, two full-time secretaries and a part-time staff. His office served approximately 4,000 students annually, and administered roughly two million dollars a year of mostly federal moneys. Within the broad guidelines set by the federal government, Van Dyke had the discretion to assess the needs of the individual students and to grant financial aid in the form of outright grants, loans or portions of both.

In the fall of 1979 it came to the attention of the Financial Aids Office that the Congress of Racial Equality (CORE) had not been paying its 20 per cent contribution to the payroll of students receiving assistance from Weber State College through work study programs. CORE was given 30 days' notice of termination and taken off the program effective November 30. Students affected by the termination were assigned to different employment. At the end of November, the director of CORE wrote letters to Weber State College, the Board of Regents, and to the Department of Health, Education and Welfare (HEW) in Denver, alleging, inter alia, discrimination in awards, unequal amounts given to blacks as opposed to whites, less desirable jobs given to blacks, no black counsel, and sexual harassment. As a result of those charges, HEW investigated the Financial Aids Office and eventually found that sexual harassment had occurred, involving a large number of female students over an extended period of time, continuing at least until the fall of 1979.

Meanwhile, as a result of newspaper coverage of the charges made by CORE, defendant KUTV (KUTV) commenced an investigation into the allegations of sexual harassment. Its Ogden Bureau Chief Carlos Amezcua interviewed two black women at the home of the director of CORE. Both students alleged sexual harassment by Van Dyke. KUTV obtained their names from the director of CORE, confirmed that they were students at Weber State College, and aired a portion of the filmed interview on its television broadcast on February 5, 1980. In addition, Amezcua and Pat Gonzales, assistant producer, interviewed white women unconnected with CORE who likewise alleged sexual harassment by Van Dyke when they met with him for financial assistance. One of those witness interviews was aired on the February 5 broadcast and two witnesses were added on subsequent broadcasts on February 7 and 12. None of the witnesses shown on any of the broadcasts was ever identified by name. A brief interview was obtained with Van Dyke as well as with the special assistant to the President of Weber State College. It, too, was made part of the February 5 broadcast.

Subsequent to that broadcast and as reported in the February 7 broadcast, several current and former Weber State coeds contacted KUTV with charges similar to those aired that they too had been sexually harassed while they were seeing Van Dyke about financial assistance.

After initially reserving a ruling until sufficient evidence was in, the court during trial, as a matter of law, ruled that Van

Dyke was a public official and that the court would instruct the jury accordingly. Van Dyke asserts two points of error: (1) The court erred in ruling that he was a public official, and that the content of the broadcast was subject to a qualified privilege. (2) The court erred in admitting testimony of witnesses not connected with the February 5 broadcast. We address those issues in that order.

### I.

In *Seegmiller v. KSL, Inc.,* Utah, 626 P.2d 968 (1981) this Court decided that the degree of fault a private individual must prove in a defamation action against a broadcaster under Utah law was negligence, not actual malice. We took the occasion in that case to review the law of defamation as it has evolved since the decision handed down in the seminal case of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). That case involved a defamation claim brought by a public official. We simply delineate in the following the substance of *New York Times,* supra, and its progeny, which will serve us as a background for our decision here.

*New York Times,* supra, abolished the strict liability standard for libel, slander and defamation against public officials theretofore prevailing at common law and established a constitutional standard of first amendment protection which could be overcome only by a showing of an intentional falsehood or reckless disregard for truth. "The constitutional guarantees require, we think, a *federal rule* that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* 84 S.Ct. at 726. [Emphasis added.]

Thus, where a defamation claim is brought by a public official, a constitutional standard or federal rule must be applied, and not one that gives deference to varying state practices. Although New York Times did not define the breadth to which the term "public official" should be extended, it nonetheless forecast the perimeters within which that term could comfortably fit. "This privilege extends to a great variety of subjects and includes matters of public concern, public men, and candidates for office." *Id.* at 727, citing *Coleman v. MacLennan,* 78 Kan. 711, 98 P. 281 (1908). The court expressly refrained from determining how comprehensive the term "public official" should be, 84 S.Ct. page 727, note 23, yet the concurring opinion of Justice Goldberg made clear that "[w]here public matters are involved, the doubts should be resolved in favor of freedom of expression rather than against it." [Citations omitted.] In an attempt to equalize the immunity of certain government officials from libel action to encourage "fearless, vigorous, and effective administration of policies of government" with a commensurate immunity of the public to comment upon official conduct, Justice Goldberg warned that citizens must be free "to applaud or to criticize the way public employees do their jobs, from the least to the most important." *Id.* at 739. See also note 5 at 739.

*Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) applied the *New York Times* standard to all statements about the private lives of public persons so long as they were relevant to the public conduct of public persons.

*Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) clarified the term "public official," although the court again refrained from drawing precise lines. In order for the constitutional standard to apply, the *New York Times case* had required that two elements be present: "There is first a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues." *Rosenblatt,* supra, 86 S.Ct. at 675. The court added "where a position in government has such apparent importance that the public has an independent interest in the qualifications and perform-

ance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply." Elaborating on this test, the court explained that "[t]he employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Id.* at 676, note 13.

In *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) a highly fractured plurality applied the *New York Times* standard so long as the alleged defamation concerned matters of public interest, irrespective of the status of the individual.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1975) receded from the expansive interpretation of Rosenbloom and focused on the status of the plaintiff. In finding that Gertz was a private individual and that the constitutional protection did not apply the court nonetheless reiterated, in dictum, the greater vulnerability to which a governmental officer exposes himself. "An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official duties [citations omitted] . . . the public's interest extends to anything which might touch on an official's fitness for office." *Id.* 94 S.Ct. at 3009.

## II.

■ Having fashioned the tools to measure the boundaries of what constitutes a "public official," we next determine whether or not the court below committed reversible error in finding, as a matter of law, that Van Dyke was a "public official" and that KUTV should be accorded the *New York Times* privilege. We note at the out-set that "as is the case with privileges generally it is for the trial judge in the first instance to determine whether the proofs show [the plaintiff] to be a 'public official.'" *Rosenblatt,* supra, 86 S.Ct. at 677 (footnote omitted). If there is competent evidence to support that finding, we are bound to abide by the trial court's ruling. If, on the other hand, the proofs show that Van Dyke was a private individual, the negligence standard promulgated under *Seegmiller,* supra, prevails and the case must be remanded for a new trial.

■ Van Dyke contends that to label him a "public official" would shield almost all defamatory comment directed against an individual of every rank, including the exemplary nightwatchman in *New York Times,* supra, behind the qualified privilege absent actual malice. In support, Van Dyke relies upon the same two elements under *Rosenblatt* cited by us above. But Van Dyke's citation omits the element of debate on public issues which tortures the test into a meaning not contemplated by the Rosenblatt court. As we construe *Rosenblatt,* a two-step analysis is in order: (1) The libeled individual must occupy a position which invites public scrutiny absent any defamatory charges, before the label of "public official" may attach to him. (2) Next, and only then, may the defamatory comment which must relate to his conduct in that position enjoy the constitutional, qualified privilege.

■ Applying this two-step analysis to the instant case, we find that both elements are present here. The public scrutiny was engendered by the use and distribution of scholarship funds at a state institution which received most of its moneys from the federal government. The position held by Van Dyke was in the Weber State College Office of Financial Aids where approximately 4,000 students received sums totalling two million dollars annually to further their education and careers. Though governed by broad federal guidelines, that office had considerable discretion to allocate, on a case by case basis, the funds at its disposal. Van Dyke was thus accountable

to the general public and held a position which invited public scrutiny. It follows that the charge of sexual harassment and intimidation during appointments for financial assistance had a direct bearing on his official conduct, satisfying the second step of the analysis.

We conclude that there was competent evidence for the trial judge to have found that Van Dyke held a position that invited public scrutiny totally apart from the defamatory comments broadcast, and that the comments bore directly upon Van Dyke's fitness and qualification to hold that position. We therefore hold that the trial court properly found that Van Dyke was a "public official" and that KUTV's broadcast was subject to a qualified privilege.

### III.

Van Dyke's next assignment of error goes to the admission of evidence from witnesses testifying to specific instances separate or different from those of witnesses identified in the February 5 broadcast. KUTV successfully argued to the court below that the charge of the broadcast was sexual harassment and that those witnesses were needed to show that the imputation was substantially as alleged and that the "gist" or "sting" of the statement was true. W. Prosser, Torts 98 (4th Ed.1971). Without deciding whether or not the evidence was properly or improperly admitted, we hold that the special verdict on the issue of falsity in favor of the plaintiff forecloses any contention that prejudicial error was committed.

The judgment is affirmed. Costs are awarded to respondent.

HALL, C.J., and STEWART, OAKS and DURHAM, JJ., concur.