**Theo BELL, Plaintiff,**

**v.**

**The ASSOCIATED PRESS, Defendant.**

**Civ. A. No. 83–0907.**

United States District Court,
District of Columbia.

March 14, 1984.

R. Kenneth Mundy, Leslie R. Crawford, Washington, D.C., for plaintiff.

Roger A. Clark, Thomas A. Shoesmith, Stuart M. Goldberg, Rogers & Wells, Washington, D.C., for defendant.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

On March 29, 1982, the Associated Press moved on its sports wire, and various newspapers subsequently published, a story reading in pertinent part as follows:

> Tampa Bay wide receiver Theo Bell, a member of the National Football League 1979 Champion Pittsburgh Steelers, is being sought on a bench warrant for alleged lewdness at a casino hotel, authorities said Monday.

It later turned out that the person charged was an imposter who had convinced hotel and police officials that he was Theo Bell. Plaintiff brought this action for libel, and defendant has moved for summary judgment. The motion will be granted.

### I

It is established that the good faith publication of fair and accurate reports of official actions is privileged. See *Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53, 56 (1971).[1] This privilege extends to arrest reports. Restatement (Second) of Torts § 611, comment "n"; see *Medico v. Time, Inc.*, 643 F.2d 134, 138–39 (3rd Cir.1981). The issue here is whether, on the facts before the Court, this privilege is a defense to the action.

The facts are as follows. Someone calling himself Theo Bell, football player for the Tampa Bay Buccaneers, was arrested on March 7, 1982, in connection with an incident of lewdness at the Tropicana Hotel in Atlantic City. An official arrest report was prepared,[2] and subsequently a summons and bench warrant were issued when Theo Bell failed to appear in Atlantic City Municipal Court on March 22 as required.

Upon being made aware of this information,[3] Robert Wade, a reporter for the Associated Press, made substantial efforts at verification. He contacted the Captain of Detectives James Dooley, the head of the Atlantic City police department's Casino Hotels Investigations Unit, and asked him to "pull the file" on the Tropicana Hotel incident. Captain Dooley advised him that "Theo Bell of the National Football League Tampa Bay Buccaneers had been detained by the police on March 7, 1982 following an incident of lewdness at the Tropicana," and he gave Wade several additional details. Wade went on to contact the Municipal Court Clerk and the Municipal Court Administrator who confirmed that a warrant was outstanding for Theo Bell for failure to answer the charges against him. The vice president for corporate and legal affairs at the Tropicana Hotel likewise confirmed that an incident had occurred at the hotel involving Mr. Bell, and an Atlantic City municipal court judge gave Wade additional information about the charges against Bell.[1]

Except in relatively minor and immaterial respects, plaintiff does not quarrel with these facts. However, he asserts that the AP story was not a report of an official action or proceeding because the arrest report did not result in plaintiff's arrest but in the arrest of the impostor. Memoran-

---

1. Pennsylvania law applies, since plaintiff was domiciled in that state and since the wire story was published there. See *Medico v. Time, Inc.*, 643 F.2d 134, 136 n. 2 (3rd Cir.1981).

2. The arrest report was for Theo K. Bell whose employer was listed as the "National Football League, Tampa Bay."

3. The source of the information was the captain of security at the Tropicana Hotel who provided

it on March 29 to another AP reporter who passed it on to Wade.

4. Wade also contacted a spokesman for the Tampa Bay team who declined comment, and he attempted to contact plaintiff himself, but he was unable to do so because plaintiff was at the time in an alcoholic rehabilitation clinic and the Tampa Bay team would not or could not make his telephone number available.

dum in Opposition at 7. That contention lacks merit.[5]

■ The point of the privilege is that it covers the reporting of both true and false factual matters. See, *e.g., Binder v. Triangle Publications, Inc., supra; Mathis v. Philadelphia Newspapers, Inc.,* 455 F.Supp. 406 (E.D.Pa.1978); *Biermann v. Pulitzer Publishing Co.,* 627 S.W.2d 87 (Mo.App.1981). In line with this principle, the article must be compared, not with the events as they actually transpired, but with the official reports that the newspaper republished. *Mathis v. Philadelphia Newspaper, Inc., supra,* 455 F.Supp. at 417; *Dameron v. Washington Magazine,* 575 F.Supp. 1575 (D.D.C.1983). If the rule were otherwise—that is, if a newspaper would have to verify in the case of every arrest and prosecution that the police had the right suspect—the reporting of criminal proceedings would largely have to cease. Such a result would be entirely at odds with American constitutional and public policy which demands that there be public scrutiny of governmental actions. The considerations underlying that policy are particularly potent when applied to proceedings which result in the arrest or detention of individuals. Where there is no such scrutiny—as is true in some totalitarian countries—individuals sometimes disappear without a trace and without public knowledge or accountability.

■ Plaintiff has conceded that defendant "thought it was me" (Appendix to defendant's motion at 15.) On that basis, and on the basis of the verifications conducted by Wade, defendant's agent, plaintiff clearly could not carry his burden of proving malice,[6] and the defense based on the reporting of official proceedings is therefore well taken.

## II

■ The same result follows from a "public figure" analysis of the case. Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classified as public figures, may recover for injury to reputation only upon proof that the falsehood was made with knowledge of its falsity or with reckless disregard for the truth. *Gertz v. Welch,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); *Waldbaum v. Fairchild Publications Company,* 627 F.2d 1287 (D.C.Cir.1980). The lesser protection public figures have from defamation rests on the proposition that, as the court expressed it in *Waldbaum, supra,* 627 F.2d at 1291–92,

> ... those who enter the public spotlight have greater access to the media to correct misstatements about them, as shown by their pre-existing media exposure. More important, in 'assum[ing] special prominence in the resolution of public questions,' public figures 'invite attention and comment.' They thus accept the risk that the press, in fulfilling its role of reporting, analyzing, and commenting on well known persons and public controversies, will focus on them and, perhaps, cast them in an unfavorable light.

627 F.2d at 1291–92. (Footnotes and citations omitted.)

Professional athletes, including football players, have frequently been held to be public figures, especially when they have achieved fame or notoriety. See, *e.g., Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3rd Cir.1979); *Brewer v. Memphis Publishing Company,* 626 F.2d 1238 (5th Cir.1980). It is with these principles in mind that plaintiff's status must be analyzed.

---

**5.** Plaintiff also contends that the proceeding was not judicial in character, but that argument is not well taken for two reasons. First, to be entitled to privilege the proceedings being reported on need only be official, not judicial; and second, here a bench warrant had been issued by a court, so that the proceeding happened to be judicial as well as official.

**6.** *Binder v. Triangle Publications, Inc., supra; Grund v. Bethlehem Globe,* 9 Med.L.Rptr. 1320, 1323 (Pa.Ct.Com.Pl.1982). Malice is implied from the unprivileged publication of defamatory words; it is negated when a defendant establishes that the publication was privileged. *Medico v. Time, Inc., supra,* 643 F.2d at 136–37 n. 2.

■ Theo Bell has long been in the public eye. He was a star athlete in high school; he set a number of records at the University of Arizona; and he was a well-known player of the Pittsburgh Steelers from 1976 to 1981.[7] His athletic career received substantial press coverage in Arizona, in Pennsylvania, and elsewhere.

Nor has plaintiff's notoriety been confined to the football field. There was a great deal of publicity when he was arrested for trespassing while at Arizona; when he pleaded guilty to disorderly conduct while in Pittsburgh; when, in recent years, he was twice arrested for drunk driving; and when in 1981 he was arrested on charges involving sexual misconduct. In fact, over one hundred newspaper articles have appeared concerning his various activities during the course of plaintiff's career.

For purposes of the law of defamation, there are two classes of public figures (1) "general purpose" public figures, that is, those who have attained such persuasive power and influence or such fame or notoriety that they may be classified as public figures in all situations, and (2) "limited purpose" public figures, that is, those who "voluntarily inject [themselves or are] drawn into a particular public controversy." *Gertz v. Welch, supra,* 418 U.S. at 351, 94 S.Ct. at 3012; *Waldbaum v. Fairchild Publications, Inc., supra,* 627 F.2d at 1292. See also, *Brewer v. Memphis Publishing Co.,* 626 F.2d 1238, 1254 (5th Cir.1980) (limited purpose public figure is one who has voluntarily engaged in activities that necessarily involve risk of increased exposure and injury to reputation). It is not necessary here to decide whether a plaintiff is a general purpose public figure under these standards, for, at a minimum, he is clearly a limited purpose public figure.

Plaintiff concedes that he is a public figure for purposes of newspaper stories concerning his role as an athlete, but he claims that the AP story "bore no relationship to [him] as a professional football player." Memorandum in Opposition at 6. That is simply in error.

As a professional athlete, plaintiff willingly assumed the public spotlight. Indeed, his contracts with National Football League teams included an obligation to "cooperate with the news media." App. 164. Those contracts further stipulated that "the success of professional football depends largely on public respect for and approval of those associated with the game," and that if a "player has engaged in personal conduct reasonably judged by [the] Club to adversely affect or reflect" on the Club, it may terminate the contract. App. 164–65. These provisions in the contracts are an accurate reflection of the realities of professional sports.

There is today considerable public interest, concern, and controversy with respect to off-the-field misconduct of professional athletes. Charges of drug abuse and trafficking and other criminal activities are often made and not infrequently sustained.[8] Since professional sports depends for its financial well-being upon television, other media exposure, and public support, events of this kind have a direct effect on the sports, the teams, and the players.[9]

Professional athletes can hardly be permitted to hold themselves out as public figures, seeking a maximum amount of publicity for themselves and their teams with respect to their athletic achieve-

7. In his capacity as a kick-return specialist, he contributed to the Steelers' Superbowl victory in 1979.

8. These matters are not foreign to plaintiff himself. According to plaintiff, a song was made up about him—"It's Oilcan Harry, that's my name, I drank that oil and I smoke cocaine." App. 30.

9. Plaintiff has recognized the relationship between on-field and off-field activities for he has often talked to the newspapers about his life away from the playing field. Thus, he has given interviews concerning his attitude toward religion, alcohol, drugs, and crime, and he has publicly recognized that his personal problems and his playing career had received widespread public attention "because I'm a public figure." App. 155.

**132**

ments,[10] while successfully claiming strictly private status when misconduct is charged or proved. Their professional careers and those of other entertainers who seek the public spotlight are so intimately tied to their personal conduct that such a distinction would be entirely unrealistic.

Just as off-the-field behavior affects the prestige and income of teams and players so does it relate to the status athletes achieve in the community. As Judge Albert V. Bryan, Jr. recently said in sentencing Washington Redskin Tony Peters on a drug charge,

> [t]he most tragic aspect of this case, aside from the criminality, ... is that the defendant is a role model in this community.... The youth of this community who are exposed daily to the temptation of drugs ... tend to look upon athletes as larger-than-life.[11]

■ In short, at least with respect to professional athletes at this particular time, charges of criminal misconduct are a subject of public controversy and those who are the subject of such charges are public figures for that limited purpose.

### III

As it turned out, the Associated Press story was in error. However, that error was entirely inadvertent.[12] In view of the peculiar circumstance of an impostor assuming plaintiff's identity, malice or reckless conduct could not possibly be ascribed to defendant. If the Associated Press were to be held liable, therefore, it would have to be on the theory that, even with respect to what appeared to be a public figure involved in an official proceeding, it had a duty not to report on the proceeding as it was reflected in the official police and

court records without first conducting a painstaking investigation into the accuracy of the official reports and the identity of the person charged.[13] Such a rule would have the consequence of delaying significantly the publication of news concerning public figures who are charged with criminal offenses, or of halting the publication of such reports altogether. Because such consequences are inconsistent with the values embodied in the First Amendment, the law does not impose such burdens on the press.

Defendant's motion for summary judgment will be granted.

---

**10.** The dissemination of the exploits of professional athletes through the media is responsible in large measure for the enormous financial rewards some of them are reaping. As the court said in *Waldbaum v. Fairchild Publications, Inc., supra,* 627 F.2d at 1294,

> [f]lame often brings power, money, respect, adulation, and self-gratification. It also may bring close scrutiny that can lead to adverse as well as favorable comment.

**11.** *Washington Post,* October 8, 1983.

**12.** Plaintiff has conceded that "I think they [the Associated Press] thought it was me." App. 15.

**13.** Here, of course, defendant's agent Wade did verify the essentials of the information he had originally received. If no such effort had been made, the result might be different.