Shelley RUSSELL, Plaintiff
and Appellant,

v.

THOMSON NEWSPAPERS, INC., dba
The Daily Spectrum, and Kristine Mes-
serly, Defendants and Appellees.

No. 900432.

Supreme Court of Utah.

Nov. 23, 1992.

B. Ray Zoll, Salt Lake City, for plaintiff and appellant.

Randy L. Dryer, Salt Lake City, for defendants and appellees.

HALL, Chief Justice:

This case arises out of a news report published December 11, 1985, in *The Daily Spectrum,* a Cedar City newspaper. The story concerned certain disciplinary pro-

ceedings initiated by the Utah State Division of Licensing (the "Division") against plaintiff Shelley Russell, a nurse at Valley View Medical Center in Cedar City, Utah, and Dr. David Brown, a Cedar City physician. As a result of the report, Russell filed suit against the reporter of the story and against *The Daily Spectrum*, alleging defamation, invasion of privacy, and intentional infliction of emotional distress. She appeals from an order entered August 8, 1990, granting defendants' motion for summary judgment and dismissing her claims. We reverse.

A trial court should grant summary judgment only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[1] Where the parties assert a factual dispute, summary judgment is appropriate only when, viewing the facts in a light most favorable to the party opposing the motion, the moving party is nevertheless entitled to judgment.[2] Following this standard, we recite the facts in a light most favorable to plaintiff Russell, the party opposing summary judgment.

On December 12, 1985, *The Daily Spectrum* ran an article regarding action taken by the Division against Dr. David Brown. The article quoted Robert Bowen, the director of the Division. In addition to the charges against Brown, it referred to charges against plaintiff and to actions taken by Brown in prescribing drugs and medical treatment for her. Plaintiff contends that the article contained several defamatory statements concerning her, including the following excerpts:

Brown overprescribed narcotic drugs to an operating room nurse who was "habituated to controlled substances," did medical procedures that were "not medically indicated" and did "ethical no-no's," Bowen said.

. . . .

Many of the charges relate to Brown's treating nurse Russell, including allega-

tions that he "ordered and administered quantities of controlled substances in excess of what is generally medically accepted as adequate."

. . . .

Brown also allegedly failed to order adequate monitoring of Russell's condition, and administered controlled substances to her intravenously without an established intravenous access, Bowen said.

. . . .

Brown's repeated administration of narcotic drugs to Russell, noted in the record to have been "habituated to controlled substances," was an action called "addictive and not justifiable," he said.

. . . .

Brown is recorded to have performed dialation [sic] and curettage procedures four times from April 1982 to August 1983 on Russell, the record says.

"That number of procedures in that period of time were [sic] not medically indicated," the charges state.

When asked what that procedure was, Bowen said, "It's for abortion."

. . . .

Prior to her termination, Russell's license to practice as a registered nurse was put on probation in April 1984 after the Professional Licensing Board found her "impaired because of drugs," Bowen said.

Charges leading to Russell's probationary status include a charge that in early 1984 she received prescribed drugs from several physicians without making each doctor aware of the others' actions, Bowen said.

. . . .

She was allegedly "impaired because of drugs" from February to August 1984, he said.

Reporter Kristine Messerly of *The Daily Spectrum* wrote the article based on the following background information. Sometime prior to September of 1984, the Divi-

---

1. Utah R.Civ.P. 56(c); *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1039 (Utah 1991); *Utah State Coalition of Senior Citizens v. Utah Power & Light Co.*, 776 P.2d 632, 634 (Utah 1989).

2. *Clover*, 808 P.2d at 1039; *see Ward v. Richfield City Corp.*, 798 P.2d 757, 758 (Utah 1990); *Hamblin v. City of Clearfield*, 795 P.2d 1133, 1135 (Utah 1990); *Owens v. Garfield*, 784 P.2d 1187, 1188 (Utah 1989); *Payne ex rel. Payne v. Myers*, 743 P.2d 186, 187–88 (Utah 1987).

sion began investigating the conduct of Brown and Russell. After interviews with numerous doctors, nurses, and administrators in the Cedar City area, the Division filed two petitions to revoke the licenses of both Brown and Russell. The Division charged Brown with unprofessional conduct based on allegations of (a) improper or inadequate medical care given to certain patients; (b) improper prescription of controlled substances to himself and members of his family; (c) improper prescription of controlled substances to Russell in excess of medically indicated dosages and in violation of medically accepted procedures; and (d) performance of improper or medically unnecessary procedures, namely four dilation and curettage procedures performed on Russell.

The Division also charged Russell with unprofessional conduct based on various alleged improprieties, including improperly obtaining controlled substances from several physicians without informing them of her other prescriptions, misrepresenting her physical condition in order to obtain controlled substances, and practicing nursing while impaired by drug dependence.

On November 13, 1985, Brown entered into a stipulation with the State of Utah to resolve the charges against him. While Brown did not admit or deny any of the allegations against him, he agreed to a 6–month suspension of his license to practice medicine and a 120–day suspension of his license to administer or prescribe controlled substances. According to the terms of the stipulation, the Division would keep its files confidential and would answer all inquiries into the results of the investigation by reference to the petition against Brown and the stipulation reached with him.

On April 15, 1985, Russell and the State of Utah entered into a stipulation allowing Russell to continue to practice nursing subject to the requirement that she submit to random drug testing for a period of one year. At the end of the 1–year period, the Division would dismiss the petition against her if the testing results were favorable.

On December 10, 1985, *The Daily Spectrum* received an anonymous tip that the Division had taken unspecified disciplinary action against Brown and a nurse. Reporter Messerly followed up on the call by telephoning the Utah Medical Association, which referred her to the Division. She then phoned the Division, where an unidentified woman told her that disciplinary action had been taken against Russell and Brown. The woman referred Messerly to Robert Bowen, the director of the Division and the State of Utah's representative designated to respond to press inquiries about disciplinary matters.

During the ensuing conversation, Bowen read the petitions against Brown and Russell and the stipulations entered in settlement of the charges. Bowen stated that the petitions and stipulations were matters of public record, but that the underlying investigative files were confidential. Bowen then responded to additional questions by Messerly. During this conversation, Bowen told Messerly about a rumor of romantic involvement between Brown and Russell and said that doctors and nurses often "trade drugs for sex." Bowen and Messerly also discussed the dilation and curettage procedures. The parties presented conflicting evidence as to whether it was Bowen or Messerly who identified abortion as the reason for the procedures.[3] Plaintiff presented evidence that Messerly asserted that the procedures were for abortions and then attributed the abortion quote to Bowen. Defendants presented evidence that Bowen told Messerly that the four dilation and curettage procedures performed upon Russell were for abortions.

After the article ran, plaintiff filed this action against the State of Utah, *The Daily Spectrum,* and Messerly based on the material published in the article. She brought

---

**3.** The assertions concerning the contents of the conversation between Bowen and Messerly and Messerly's belief about the abortion statement are excerpted from Bowen's and Messerly's depositions. Defendants argue that these depositions are not part of the record on appeal. However, defendants moved the trial court to publish the depositions, and both parties argued extensively to the trial court from the depositions without objection from defendants. Therefore, we deem this argument to be waived by defendants and consider the deposition material that was actually before the trial court.

claims for defamation, invasion of privacy, and intentional infliction of emotional distress. The trial court dismissed the action against the State of Utah on its motion for summary judgment based on governmental immunity.

Defendants Messerly and *The Daily Spectrum* moved for summary judgment, claiming that statutory and common law privileges protected the statements printed in the article.[4] Despite conflicting evidence concerning the source of the abortion statement, the trial court granted defendants' motion for summary judgment. The trial court construed Utah Code Ann. § 45–2–3(4) to afford defendants a conditional privilege that required plaintiff to show actual malice to state a cause of action for defamation. The court found that no genuine issue of fact existed as to whether plaintiff had shown actual malice and therefore dismissed her cause of action. In addition, the court dismissed plaintiff's claims of invasion of privacy and intentional infliction of emotional distress.

■ The existence of a privilege is a question of law for the court. We therefore give no deference to the trial court's determination that defendants' statements are privileged, but review it for correctness. The trial court found the statements in *The Daily Spectrum* privileged under Utah Code Ann. § 45–2–3(4), the fair report privilege. For a statement to qualify for privilege under this statute, it must fulfill the following elements: It must be a report of a judicial, legislative, or other public official proceeding or of anything said in the course thereof or of a charge or complaint upon which a warrant shall have been issued or an arrest made; it must be a fair and true report of the proceeding or charge; and it must be made without malice.[5]

■ Plaintiff claims that the article does not meet the requirements of this statute because no warrant issued against her or against Brown. Plaintiff relies on our case of *Seegmiller v. KSL, Inc.*[6] for the proposition that section 45–2–3(4) applies only to those charges or proceedings upon which a warrant has issued. In *Seegmiller*, we stated:

> To extend the concept of a qualified privilege to mere allegations of criminal conduct is impermissible.... [S]ince § 45–2–3(4) and § 45–2–10(3) limited the privilege to actual, *official charges* of criminal conduct, there is a clear implication that mere allegations of conduct which might be violative of the criminal law should not be construed to fall within the privilege. By setting the boundaries as it did, the Legislature must have intended that allegations of criminal conduct not buttressed by official action should not be included within the privilege.[7]

However, *Seegmiller* does not stand for the proposition that the statutory privilege applies only to reports of official criminal proceedings. Such an interpretation would nullify the statutory language regarding "judicial, legislative or other public official proceedings." The official proceedings of our government encompass many areas of human affairs beyond the criminal law.[8] The statutory privilege should protect the right of the press to report on, and the

---

4. Defendants claimed that the article was privileged under Utah Code Ann. § 45–2–3, which reads in relevant part:
   A privileged publication or broadcast which shall not be considered as libelous or slanderous per se, is one made:
   ....
   (2) In any publication or broadcast of or any statement made in any legislative or judicial proceeding, or in any other official proceeding authorized by law....
   ....
   (4) By a fair and true report, without malice, of a judicial, legislative, or other public official proceeding, or of anything said in the course thereof, or of a charge or complaint made by any person to a public official, upon which a warrant shall have been issued or an arrest made.

5. Utah Code Ann. § 45–2–3(4).

6. 626 P.2d 968 (Utah 1981).

7. *Id.* at 978 (emphasis in original).

8. Indeed, plaintiff's reading of the statute would eviscerate the protection for reports on legislative proceedings, which are rarely, if ever, criminal proceedings and do not result from the issuance of a warrant.

right of the public to know of, the areas in which government operates. A correct interpretation of the statute must encompass all official governmental proceedings, not merely criminal proceedings resulting from the issuance of a warrant.

■ The conclusions we reach in this case do not conflict with *Seegmiller*. The broadcast in that case reported on complaints made by a private citizen upon which no official public action had been taken.[9] The charges against Brown and Russell that *The Daily Spectrum* reported were "buttressed by official action." Although no criminal warrant was issued, the Division did issue petitions for license revocation against Brown and Russell. The Physician's Licensing Board and the Division are administrative agencies of the state of Utah, whose actions are governed by the Utah Administrative Procedures Act ("UAPA").[10] Administrative agency action under the UAPA is exactly the type of "other public official proceeding" intended to endow a report with privilege under section 45–2–3.[11]

■ Plaintiff also claims that the report was not of an official proceeding because the stipulations between Brown and the Division and between Russell and the Division were already complete and the cases against them were final and closed when the article was published. The facts, even when viewed most favorably to plaintiff, do not support her claim. At the time the article was published, the Division had not dismissed its petition against her, but had merely agreed not to prosecute the petition pending a 1–year monitoring period. Further, even if the Division had completed its proceedings against plaintiff and Brown, we see no reason to limit the press to reporting on official proceedings still in progress. Such a reading would have the absurd result of protecting press reports in the earliest stages of a proceeding, but would remove that protection for a report on the proceeding's final result. A fair reading of the statute applies the conditional privilege to reports of official proceedings whether those proceedings are ongoing or completed.

■ Plaintiff also claims that the fair report privilege does not extend to the statements quoted from Bowen, the Division director. By its own terms, section 45–2–3(4) extends to statements made in the course of official proceedings as well as to the proceedings themselves.[12] We believe that this protection of statements made in official proceedings extends the scope of the privilege to statements by public officials in charge of the proceeding or authorized to remark on the proceeding.[13] Bowen was the Division representa-

---

**9.** *Id.* at 970–71.

**10.** The UAPA is located at Utah Code Ann. §§ 63–46b–1 to –17. Utah Code Ann. § 58–1–3.5 specifies, "The Division of Occupational and Professional Licensing shall comply with the procedures and requirements of Chapter 46b, Title 63, in all of its adjudicative proceedings conducted under the authority of this title." The proceedings against Brown and Russell were conducted prior to the adoption of this section and prior to the effective date of the UAPA. However, the actions taken by the Division in the Brown and Russell cases similarly qualify as agency actions.

**11.** Our decision is supported by numerous other courts which have found that a variety of public proceedings qualify as privileged under similar statutes. *See, e.g., Porter v. Guam Publications, Inc.*, 643 F.2d 615, 617–18 (9th Cir.) (criminal investigation), *cert. denied*, 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981); *Fried v. Daily Review*, 11 Med.L.Rep. 2145, 2147 (Cal.Ct.App.

1985) (city council meeting); *Goodrich v. Waterbury Republican–American*, 188 Conn. 107, 448 A.2d 1317, 1327 (1982) (legislative proceedings); *Stablein v. Schuster*, 183 Mich.App. 477, 455 N.W.2d 315, 318 (1990) (school board meetings); *Brayshaw v. Gelber*, 232 N.J.Super. 99, 556 A.2d 788 (1989) (physician licensing proceedings). We express no opinion as to the application of section 45–2–3(4) to agency or other administrative proceedings that are exempt from the UAPA.

**12.** Utah Code Ann. § 45–2–3(4) defines a privileged communication as one made "[b]y a fair and true report, without malice, of a ... public official proceeding, *or of anything said in the course thereof.*" (Emphasis added.)

**13.** *Molnar v. Star–Ledger*, 193 N.J.Super. 12, 471 A.2d 1209, 1218 (1984); *Bell v. Associated Press*, 584 F.Supp. 128, 130 (D.D.C.1984); *Gawel v. Chicago Am. Publishing Co.*, 1 Ill.App.3d 481, 274 N.E.2d 628, 629 (1971); *Turnbull v. Herald Co.*, 459 S.W.2d 516, 520–22 (Mo.Ct.App.1970).

tive charged with responding to the press or others who inquired about disciplinary matters, including those actions taken against Brown and Russell. Therefore, unless defendants knew Bowen had exceeded or violated this authority to comment on the hearings,[14] all quotes in the article attributable to Bowen deserve the same degree of privilege as the reports of the official proceedings he commented on.

■ Finally, section 45–2–3(4) requires that the publication be a "fair and true report" of the proceedings. This does not mean that all individual statements or allegations made in the proceeding must be true for the report to be privileged, but merely that the report must accurately reflect the proceedings and the statements or allegations made therein. If the report correctly and accurately reflects the proceedings it covers, then it will maintain the privilege, absent malice, regardless of the falsity of the statements or allegations made in the proceedings themselves.

■ All but one of the statements in the article clearly represent a fair and true report to which the privilege applies. The statements are quoted either directly from the petitions and stipulations of the Division proceeding or from Bowen as director of the Division. However, the abortion quote, which Bowen denies making, stands on different footing. This quote involves a factual dispute as to whether Bowen actually made the statement attributed to him. If he made the statement, the publication is a fair report of the proceedings and official comments. If he did not make the statement, it is simply not a "fair and true report" of the official proceeding or comment on the proceeding. Therefore, because resolution of this factual dispute is necessary to determine whether the fair report privilege applies, summary judgment on the basis of the fair report privilege was inappropriate.

■ Defendants contend that even if the abortion quote was not protected under the fair report statute, it must still be protected under the common law privilege allowing fair comment on matters of public concern. Fair comment is a common law defense to an action for defamation. The fair comment defense privileges a statement when it involves a matter of public concern, is based on true or privileged facts, and represents the actual opinion of the speaker, but is not made for the sole purpose of causing harm.[15] According to the majority rule, the privilege applies only to an expression of opinion, not to a false statement of fact, whether it is expressly stated or implied from an expression of opinion.[16]

■ Allegations of misconduct against a local doctor and nurse are certainly matters of public concern, particularly in a community the size of Cedar City. The statement is nevertheless not protected under the fair comment doctrine. In *Utah State Farm Bureau Federation v. National Farmers Union Serv. Corp.,*[17] the

---

**14.** Plaintiff asserts that because Brown's stipulation included a confidentiality agreement, Bowen's further statements on the matter were outside the scope of his authority and therefore quotes of those statements should not receive the privilege. However, at the least, Bowen had apparent authority to answer questions concerning the proceeding, and the media should be entitled to rely on those answers. If Bowen exceeded his authority in making comments in violation of the confidentiality agreement, then the parties to that agreement may have a claim against him for the breach.

Plaintiff also asserts that Bowen's statements should not be privileged because they were merely gratuitous personal commentary and not made "in the course of the proceeding." While Bowen did make several comments concerning a possible romance between plaintiff and Brown, the comments are not included in the article of which plaintiff complains. With the possible exception of the abortion quote, all statements actually printed in the story that are attributed to Bowen relate directly to the proceedings and the charges by the Division. Similarly, the abortion quote, if Bowen's, was an explanation of the charges against Brown and Russell and is protected by the fair report privilege.

**15.** *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 13, 110 S.Ct. 2695, 2702–03, 111 L.Ed.2d 1, 14 (1990).

**16.** *Id.* 497 U.S. at 13, 110 S.Ct. at 2702–03, at 14 (citing Restatement (Second) of Torts § 566 (1977)).

**17.** 198 F.2d 20 (10th Cir.1952).

Tenth Circuit distinguished between commentary and facts in a publication. That case states:

> "[T]o state matters which are libelous is not comment or criticism." The law draws a clear distinction between criticism or comment, which may or may not be privileged, depending upon the circumstances in which it was uttered, and publication of an unequivocal and unambiguous fact, the legal import and effect of which is a question of law for the courts to decide, leaving only its truth or falsity for the determination of the jury.[18]

In this case, the abortion statement purports to be a quote from a public official concerning a fact about Russell's medical history. It does not merely offer an opinion concerning her conduct or that of Brown. For purposes of this appeal, we assume that the abortion statement is false. Accordingly, it simply is not protected "comment," but is a false assertion of fact outside the scope of the fair comment privilege.

We reverse the decision of the trial court dismissing plaintiff's defamation claims. The fair comment privilege does not protect assertions of fact like the statement at issue here.[19] Moreover, the abortion quote, if made by Messerly and not Bowen, is not protected by the fair report privilege of section 45–2–3(4). The question of who made the statement is therefore a material issue of fact to be resolved at trial. If a jury determines that Bowen did not make the abortion statement, then the fair report privilege does not apply and plaintiff may prevail if she can show negligence on the part of *The Daily Spectrum* in making the statement.[20]

**18.** *Id.* at 23 (citations omitted) (quoting *Williams v. Standard Examiner,* 83 Utah 31, 27 P.2d 1, 15 (1933)).

**19.** Although the fair comment privilege does not apply to the facts of this case, we make the following observation concerning the privilege for the benefit of the bench and bar. *See* Utah R.App.P. 30(a); *Wade v. Jobe,* 818 P.2d 1006, 1009 (Utah 1991). We recognize that in *Milkovich,* the United States Supreme Court constitutionalized a portion of the common law fair comment privilege, holding that the Constitution protects publication of an opinion on a matter of public concern unless the opinion stated or reasonably implied false facts. *Milkovich,* 497 U.S. at 18–19, 110 S.Ct. at 2706–07, 111 L.Ed.2d at 19. The Court also held that the plaintiff must prove that the statement was made with the requisite level of fault, depending on whether he or she is a public or private figure. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *Gertz v. Welch,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). Notwithstanding the fact that *Milkovich* subsumes a portion of the common law fair comment privilege, the common law privilege also protects an opinion that is based on *privileged* facts, a subject not discussed by the majority opinion in *Milkovich.* Consequently, the common law privilege remains viable independent of the Constitution, and we reaffirm our commitment to the privilege at this time.

**20.** *See Seegmiller,* 626 P.2d at 974; *Gertz,* 418 U.S. at 347, 94 S.Ct. at 3010. In *Seegmiller,* we established a negligence standard for private figure plaintiffs. Here, plaintiff alleges that she is a private, as opposed to a public, figure, and defendants do not argue otherwise. However, for the guidance of the bench and bar, we make the following observations concerning the public-private figure distinction.

For the heightened protection of actual malice to apply, a plaintiff must be either a public figure or a public official. A public figure is one who has either (1) attained special prominence in the affairs of society and thus assumes a public figure role voluntarily, or (2) thrust himself or herself to the forefront of public controversies in order to affect the outcome of those controversies. *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009. The former category is known as a "general purpose public figure," and the latter, as a "limited purpose" public figure. *See Ruebke v. Globe Communications Corp.,* 241 Kan. 595, 738 P.2d 1246, 1251 (1987); *Kurth v. Great Falls Tribune Co.,* 246 Mont. 407, 804 P.2d 393, 394 (1991). A public *official,* on the other hand, is one who holds a position in government which has such apparent importance that the "'public has an independent interest in the qualifications and performance of the person who holds'" that position. *Van Dyke v. KUTV,* 663 P.2d 52, 54–55 (Utah 1983) (quoting *Rosenblatt v. Baer,* 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966)).

Contrary to our implication in *Madsen v. United Television, Inc.,* 797 P.2d 1083, 1085 (Utah 1990), in which we reasoned that a police officer was a public official largely because he had "tak[en] a life in the process of apprehending a suspect," the public official's position "'must be one which would invite public scrutiny and discussion of the person holding it, *entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy.'*" *Van Dyke,* 663 P.2d at 55 (quoting

If, on the other hand, the jury determines that the abortion statement originated with Bowen, then defendants' publication meets the requirements for a qualified privilege under section 45–2–3(4), and plaintiff must prove "malice" to overcome the conditional privilege granted by that statute.[21] Plaintiff raises a question concerning the definition of "malice" for purposes of section 45–2–3. We have previously noted that this section is derived from the common law and have cited to the common law standard of malice in deciding cases where the defendant claims a privilege under the section.[22] Under the common law standard of malice, to overcome a conditional privilege, a plaintiff must show " 'an improper motive such as a desire to do harm or that the defendant did not honestly believe his statements to be true or that the publication was excessive.' "[23]

■ However, in deciding cases under section 45–2–3, we have also cited with approval the definition of actual malice, the constitutional standard the Supreme Court enunciated in *New York Times v. Sullivan*.[24] Under the actual malice standard, a plaintiff must show that the defendant published the alleged defamatory material " 'with knowledge that it was false or with reckless disregard of whether it was false....' "[25]

The legislature's use of the term "malice" in section 45–2–3(4) creates confusion as to the correct definition of that term in the statute. Actual malice refers to the constitutionally mandated level of fault necessary in public figure cases.[26] On the other hand, malice under section 45–2–3(4) does not operate as a standard of fault; it is simply a means of determining when the privilege of that section is forfeited.

The actual malice standard was created to protect the press from undue liability in publishing articles and material about public officials and public figures. Its purpose is to protect the free flow of information concerning the activities of these individuals and matters of public concern. The actual malice standard of *New York Times* therefore serves a different purpose and function than the qualified privileges found in section 45–2–3.[27]

■ The appropriate degree of malice that must be proven to successfully over-

---

*Rosenblatt*, 383 U.S. at 86 & n. 13, 86 S.Ct. at 676 & n. 13 (emphasis added)).

One last point deserves mention. Plaintiff here allegedly engaged in improper conduct that was the subject of the original petition filed against her and the subsequent publication in *The Daily Spectrum*. The question arises whether plaintiffs who commit a crime, which in turn propels them into the spotlight, become limited public figures by virtue of their actions. Generally speaking, a person who engages in criminal conduct does not automatically become a public figure. *Seegmiller*, 626 P.2d at 972 ("Even if [plaintiff was] in fact guilty of a misdemeanor ... that fact by itself would not be sufficient to compel the conclusion that he is a public figure."); *Ruebke*, 738 P.2d at 1251 (citing *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 167, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979)). However, circumstances do exist that warrant imposition of limited public figure status upon a "criminal plaintiff," such as whether the crime committed is a public controversy and whether the nature and extent of the plaintiff's participation in the controversy was enough to cause him or her to become a public figure. *Ruebke*, 738 P.2d at 1252. Thus, in *Ruebke*, a man arrested and indicted for triple murder was a public plaintiff for purposes of his defamation action due to the extensive publicity of the case and his role in creating that publicity, as well as

the heinous nature of his alleged crime. *Id.* Hence, we conclude that a defamation plaintiff accused of a crime may be deemed a public figure solely by virtue of committing a crime.

**21.** Utah Code Ann. § 45–2–3(4); *Seegmiller*, 626 P.2d at 977; *see also Brehany v. Nordstrom*, 812 P.2d 49, 58 (Utah 1991).

**22.** *Brehany*, 812 P.2d at 58–59; *Ogden Bus Lines v. KSL Inc.*, 551 P.2d 222, 225 (Utah 1976); *see also Cox v. Hatch*, 761 P.2d 556, 559 n. 1 (Utah 1988) (noting distinction between common law malice and "actual malice" as defined in *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 725–26).

**23.** *Ogden Bus Lines*, 551 P.2d at 225 (quoting *Direct Import Buyers Ass'n v. KSL, Inc.*, 538 P.2d 1040, 1042 (Utah 1975)).

**24.** *See id.* at 225–26.

**25.** *Id.* at 226 (quoting *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 726).

**26.** *See New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 725–26.

**27.** *See Brehany*, 812 P.2d at 59; *Cox*, 761 P.2d at 559 n. 1; *Seegmiller*, 626 P.2d at 972–73.

come the statutory privilege is the common law standard from which the statute was derived. This standard creates, in effect, an absolute privilege for a defendant's statements *unless* the statements were made with ill will, were excessively published, or the defendant did not reasonably believe his or her statements were true.[28]

If defendants here are not protected by the fair report privilege (i.e., either Messerly made the abortion statement or Bowen made the statement but defendants published it with common law malice), then Russell must establish only that the publication was made with the requisite level of fault. Because she is a private figure, that level is negligence, not actual malice.[29]

■ The trial court ruled that plaintiff failed to show actual malice. That standard was incorrect. Whether the evidence in a defamation case is sufficient to support a finding of malice is a question of law.[30] Therefore, we substitute the correct standard of proof in this case and analyze the evidence under the proper standard. Plaintiff presented the deposition testimony of Bowen, who stated that he did not make the abortion statement. Assuming for purposes of appeal that the false statement originated with Messerly, the question becomes whether publication of the false statement was negligent. If so, plaintiff may recover for defamation. Therefore, if on remand the trial court finds that defendants are not protected by section 45–2–3(4), plaintiff is entitled to present her evidence of fault to the finder of fact.[31]

■ The trial court also dismissed plaintiff's claims for intentional infliction of emotional distress and invasion of privacy. We recognized the right of a plaintiff to maintain a claim for intentional infliction of emotional distress in the case of *Samms v. Eccles.*[32] In *Samms*, we outlined the elements of an action for intentional infliction of emotional distress. To prove such a claim, a plaintiff must show (a) that the defendant intentionally engaged in some conduct toward the plaintiff considered outrageous and intolerable in that it offends the generally accepted standards of decency and morality (b) with the purpose of inflicting emotional distress or where any reasonable person would have known that such would result, and (c) that severe emotional distress resulted as a direct result of the defendant's conduct.[33]

■ Defendants maintain that the cause of action for emotional distress should be subsumed within plaintiff's defamation action. We disagree. Although defamation claims often assert that a plaintiff has suffered emotional distress and humiliation, the gravamen of a defamation action is injury to reputation. An action for intentional infliction of emotional distress protects the emotional well-being and security of the individual against intentional and outrageous acts designed to produce distress.[34] The nature and purposes of the actions are distinct, and in appropriate circumstances, each may be maintained. The tort of intentional infliction of emotional

---

**28.** *See Ogden Bus Lines,* 551 P.2d at 225 (quoting *Direct Import Buyers Ass'n,* 538 P.2d at 1042). Plaintiff has the burden of presenting evidence to overcome the privilege. *Id.*

**29.** *Seegmiller,* 626 P.2d at 973; *Gertz,* 418 U.S. at 345–47, 94 S.Ct. at 3009–11. Conversely, a public figure plaintiff must prove common law malice to overcome the qualified privilege and additionally prove actual malice as the requisite level of fault before he or she may recover for defamation.

**30.** *Milkovich,* 497 U.S. at 17, 110 S.Ct. at 2705, 111 L.Ed.2d at 17.

**31.** Russell also argues that other statements from the publication, besides the abortion

quote, are defamatory. Those statements were direct quotes or paraphrases taken from the petitions, stipulations, and orders filed against Brown and Russell. We have reviewed the statements and find that Russell has presented no evidence to show that defendants forfeited the qualified privilege by publishing them. We therefore affirm summary judgment as to those statements.

**32.** 11 Utah 2d 289, 358 P.2d 344 (1961).

**33.** *Id.* 358 P.2d at 346–47.

**34.** *See generally* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 12, at 60–65 (5th ed. 1984).

distress is not, therefore, subsumed within a defamation claim.[35]

■ However, we do recognize that where an emotional distress claim is based on the same facts as a claim for defamation, appropriate concern for the First Amendment rights of the parties must be considered. A plaintiff may not recover for the tort of emotional distress by reason of a defamatory publication absent a showing of the requisite level of fault.[36] Hence, where a private figure plaintiff brings suit against a media defendant, alleged defamatory words do not give rise to a cause of action for emotional distress absent a showing of negligence as to the falsity of the statement published.[37]

We therefore hold that plaintiff must show negligence as to the falsity of the publication by a media defendant to establish a claim of intentional infliction of emotional distress.[38] Hence, if plaintiff can show on remand that defendants published the article negligently, her claim for inten-

tional infliction of emotional distress will prevail if the jury also finds that defendants' acts were outrageous and intolerable and did in fact cause her emotional distress.

Plaintiff also appeals the trial court's dismissal of her claim for invasion of privacy. She argues that the article violated her privacy because it constituted unreasonable publication of facts about her private life and placed her in a false light before the public.[39]

Defendants again claim that a separate action may not be maintained for invasion of privacy in a defamation case. For the same reason that an intentional infliction of emotional distress claim is distinct from a defamation claim, invasion of privacy is also distinct. The invasion of privacy claim protects an individual's interest in being let alone. This interest is distinct from the interest in reputation. Further, an action for invasion of privacy may be the only

---

**35.** Defendants also argue that publication of defamatory statements by the press should never be considered an outrageous and intolerable act that would give rise to a claim for intentional infliction of emotional distress. We decline to take such an absolute view of the possible circumstances surrounding the publication of news items. It is conceivable that the mere publication of falsehoods concerning an individual could constitute extreme and outrageous conduct warranting a remedy for the ensuing emotional distress.

**36.** See Hustler Magazine Inc. v. Falwell, 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988).

**37.** An additional concern is whether the qualified privilege of section 45–2–3(4) applies only to a claim for defamation or whether it also applies to other claims based on the same operative facts, such as emotional distress and invasion of privacy. Joining several courts that have directly or indirectly dealt with this issue, we think that the privilege does apply to other claims that are based upon a defamatory publication. See Deaile v. General Tel. Co. of Cal., 40 Cal.App.3d 841, 115 Cal.Rptr. 582, 587 (1974) (privilege applied in action for intentional infliction of emotional distress); Pettitt v. Levy, 28 Cal.App.3d 484, 104 Cal.Rptr. 650, 653 (1972) (privilege applied in action for negligent infliction of emotional distress); Lashlee v. Sumner, 570 F.2d 107, 108–09 (6th Cir.1978) (shorter statute of limitations for defamation applied to related claim for intentional infliction of emotional distress); Eastwood v. Cascade Broadcast-

ing Co., 106 Wash.2d 466, 722 P.2d 1295, 1299 (1986) (false light invasion of privacy claim based on defamatory statements was governed by the statute of limitations for libel). If the trial court determines on remand that section 45–2–3(4) applies to the defamation claim, then it also applies here.

**38.** We do not mean to imply that in all cases where negligence is proven, the defendant is automatically liable for intentional infliction of emotional distress. The appropriate standards for private or public figures are merely thresholds below which conduct, as a matter of law, may not subject a defendant to liability. A private figure plaintiff wishing to assert an emotional distress claim must first meet the threshold of negligent publication and must then prove that the defendant's conduct was extreme and outrageous under all the circumstances. Once the threshold issue of negligence is reached, however, the matter of outrageousness becomes a question for the jury.

**39.** On appeal, defendants claim that plaintiff argued only a publication-of-private-facts claim in the court below and therefore her claim of false light privacy should be disregarded as raised for the first time on appeal. Defendants misrepresent the proceedings below. An examination of the record reveals that the argument advanced in the trial court was nearly identical to the argument advanced on appeal and centered on a false light claim. Therefore, we address plaintiff's claim on the merits.

available remedy when the statements complained of are not themselves false, but merely place the plaintiff in a false light.[40] In *Cox v. Hatch*,[41] we examined a claim for invasion of privacy under the false light doctrine. We recognized this claim as it is delineated in section 652E of Restatement (Second) of Torts. The Restatement gives the following definition of a false light claim:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor has knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.[42]

 Like a claim for emotional distress, a false light claim predicated on publication of a defamatory statement is subject to First Amendment protections. However, comment d to section 652E recognizes the effect that *Gertz* has on that section, stating that the actual malice standard apparently does not apply to private figure plaintiffs.[43] Therefore, proof of plaintiff's claim for false light invasion of privacy requires a showing of negligence in the publication of the statements about her.

If on remand plaintiff can make a threshold showing of negligence by a preponderance of the evidence, she may maintain her claim for invasion of privacy provided she can also prove that the publication of the statements in the article would be highly offensive to a reasonable person.

Reversed and remanded for further proceedings consistent with this opinion.

STEWART, DURHAM and ZIMMERMAN, JJ., concur.

HOWE, Associate Chief Justice (concurring):

I concur, but express no opinion on observations made in the footnotes that are not essential to the decision in this case.

---

**40.** *See* Restatement (Second) of Torts § 652E cmt. c (1977) and examples cited therein.

**41.** 761 P.2d 556, 564 (Utah 1988).

**42.** Restatement (Second) of Torts § 652E (1977); *see also Cox,* 761 P.2d at 564.

**43.** *See also Wood v. Hustler Magazine, Inc.,* 736 F.2d 1084, 1091 (5th Cir.1984) (applying negligence standard to false light claim brought by private figure); *Braun v. Flynt,* 726 F.2d 245, 249 (5th Cir.1984) (holding that defendant who placed private figure in a false light was not entitled to heightened protection of actual malice standard).