Earl HARPER, Jr., 7145 Donnell Place, # C4, Forestville, Maryland, 20747, Plaintiff,

v.

Del WALTERS, 3000 Tilden Street, N.W., Washington, D.C., 20008, and Albritton Communications Co., 800–17th Street, N.W., Suite 301, Washington, D.C., 20006, and WJLA–TV–7, 3000 Tilden Street, N.W., Washington, D.C., 20008, Defendants.

Civ. A. No. 92–0747–LFO.

United States District Court, District of Columbia.

May 28, 1993.

Charles L. Thomas, Washington, DC, for plaintiff.

David J. Branson, Anthony F. King, Kaye, Scholer, Fierman, Hays & Handl, Washington, DC, for defendants.

## MEMORANDUM

OBERDORFER, Senior District Judge.

Plaintiff, a former attorney at the Equal Employment Opportunity Commission (EEOC), brings this defamation suit against defendants, Del Walters, a television investigative journalist; WJLA–TV, a local television news station; and Albritton Communications Company. At issue are two televised reports regarding plaintiff's alleged personal misconduct that defendants aired during the Senate Judiciary Committee's confirmation hearings of Supreme Court Justice Clarence Thomas. Because the broadcasts are privileged under District of Columbia law as fair and accurate publications of matters in official reports, and because defendant has introduced no evidence that a jury reasonably could find to be clear and convincing proof of malice, summary judgment is granted for defendants.

## I.

At 6:00 p.m. and 11:00 p.m. on the evening of October 11, 1991, during the Supreme Court confirmation hearings of Clarence Thomas, WJLA–TV aired broadcasts by Del Walters, a reporter with WJLA–TV's investigative reporting unit.[1] The substance of the broadcasts was that in 1983, when Clarence Thomas was serving as Chairman of the EEOC, he had failed to act on numerous charges of sexual harassment against plaintiff Harper, who at that time worked as an attorney in the EEOC's Office of General Counsel. An EEOC investigation of Harper's conduct had resulted in two proposals from the EEOC's Office of General Counsel that Harper be transferred, and ultimately that he be fired, for his misconduct. Thomas, however, allowed Harper to retire before any disciplinary action was taken.

The WJLA–TV broadcasts expressly stated that they were based on the two EEOC proposals and quoted directly from the report of EEOC General Counsel, David Slate. Plaintiff here challenges two specific statements in the broadcasts: first, that Harper had been "charged with sexually harassing thirteen different women,"[2] and second, that the allegations against Harper had included "statements Harper played with his genitals on two occasions in front of two separate women." Def. Ex. C at 3. The broadcasts displayed portions of the Slate report, highlighting and magnifying the words "masturbating" and "played with your genitalia" in the text. Def. Ex. E (videotape). Following the broadcasts, Senators Howell Heflin of Alabama and Orrin Hatch of Utah both referred to the WJLA–TV report and to Earl Harper in subsequent televised Judiciary Committee proceedings.

The background events to the 1991 WJLA–TV broadcasts began in August 1983, when the EEOC began disciplinary proceedings against Harper. At that time, Associate General Counsel of the EEOC Michael Middleton determined that while serving at the EEOC headquarters in Washington, D.C. between 1981 and 1983, Harper had sexually

---

**1.** The texts of the broadcasts are set out in *haec verba* as Exhibits C and D to Defendants' Motion for Summary Judgment. A videotape of the broadcasts is included as Defendants' Exhibit E.

**2.** Def. Ex. C at 1. The broadcasts included other statements that "[t]hirteen women say Earl Har-

per harassed them," *id.* at 2, "thirteen women complained they had been harassed by Earl Harper," *id.* at 3, and "thirteen women alleged Earl Harper sexually harassed them." Def. Ex. D at 1.

harassed or otherwise engaged in improper sexual relationships with thirteen female employees of the agency. Middleton detailed his findings in a formal Notice of Adverse Action on September 22, 1983. Def. Ex. F ("Middleton Notice"). This notice was one of the two Notices of Adverse Action relied upon by WJLA–TV in compiling its October 11, 1991 broadcasts.

In the Notice, Middleton proposed that Harper be transferred immediately from his then-supervisory position at the EEOC office in Baltimore to a non-supervisory position in the agency's office in Washington, D.C. The Notice specified allegations of 14 female EEOC employees as the basis for the proposal. According to Middleton, each of the women reported either some form of sexual overture from Harper or having been involved in a relationship with him. The Notice cited statements by two female employees (identified by name) that Harper had frequently "rubbed, fondled, or played with" his genitals and appeared to be masturbating in their presence.[3] Middleton concluded that standing alone, many of the individual incidents reported would have justified the transfer he proposed. "Taken together however," he concluded,

> these incidents comprise a pattern of conduct on your part which has created an intimidating, hostile and offensive working environment characterized by a sexually harassing atmosphere. Such conduct clearly violates the principles of Title VII which prohibit sexual harassment in the workplace.

*Id.* at 4.

The Middleton Notice stated that it was only a proposal and that Harper would have the opportunity to answer the Notice orally and in writing to David Slate, General Counsel of the EEOC. It stated that Harper could request and examine the materials on which the Notice was based and that Harper could furnish affidavits, other documentary evidence, and a written answer to the proposed adverse action within ten days of receipt of the Notice. The Notice stated that any timely reply by Harper would be "fully considered" before a final written decision was made. *Id.* at 4–5.

Harper's counsel filed a response to Middleton's Notice on October 20, 1983, and presented oral arguments in a formal hearing on the proposed transfer before General Counsel David Slate and Slate's Senior Advisor. On December 2, 1983, Slate issued a written memorandum to Harper indicating that Harper's transfer had been made final. Chairman Thomas concurred in the transfer in a separate memorandum to Slate of the same date. Def. Ex. G at 20–21; *see also* Def. Ex. 8, Deposition of Earl Harper, Jr. ("First Harper Dep.") at 84–91.

On December 2, however, General Counsel Slate also issued a separate Notice of Adverse Action to Harper, which was the second EEOC document relied upon by WJLA–TV. Def. Ex. G ("Slate Notice").[4] The Slate Notice recommended that Harper should not be transferred but instead should be fired from the EEOC. Slate stated that after "careful consideration" of both Harper's written and oral responses to the Middleton Notice and the written file, Slate had "concluded that Mr. Middleton's proposed adverse action was too lenient" and decided to rescind it. *Id.* at 1. The Slate Notice continued as follows:

> This notice of proposed adverse action identifies *thirteen different women*, currently or formerly employed by the Commission, who at various times were assigned to work under your direct supervision. With one exception, each of these employees personally provided information in the form of affidavits, testimony, or interviews (all of which has already been available for your review) that reveals that during the time you were their supervisor, you either sexually harassed them, had a romantic or sexual relationship with them,

---

**3.** Middleton reported the specific allegations and the names of the two employees who made them. *See* Def. Ex. F at 3.

**4.** Chairman Thomas' December 2, 1983 concurrence in Harper's transfer indicated that he agreed with the transfer "subject, of course, to [his] final decision" on Slate's Notice of Proposed Adverse Action issued to Harper on the same date. Pl.Ex. G at 21.

or that your conduct resulted in a reputation that made a number of your subordinate female employees wary of possible advances of a sexual nature by you.[5]

*Id.* at 2–3 (footnotes omitted) (emphasis added). Of the thirteen women, Slate concluded that seven of their claims constituted actual sexual harassment. These included the specifications of the two who alleged that Harper had masturbated or played with his genitals in front of them. *Id.* at 9. Slate rejected Harper's argument that these allegations did not on their face constitute sexual harassment under the EEOC guidelines. The Slate Notice also recounted the allegations of Patsy Stewart that Harper had engaged in similar behavior before her.[6] Although Harper had challenged the veracity of Stewart's statements, Slate concluded that Harper's responses were "not sufficient" to discredit her allegations, *id.* at 4, and noted that Stewart's testimony did "not reveal any significant inconsistencies as to the substance of her complaints." *Id.* at 5.

Slate stated that the other six women's allegations did not appear to "actually constitute sexual harassment" by Harper. *Id.* at 3. However, he believed these allegations constituted "evidence of conduct that supports [Harper's] reputation and otherwise tends to support the allegations of conduct" that properly could be considered under the EEOC guidelines. *Id.* He therefore "included these specifications in [his] deliberations." *Id.*

Slate concluded in his Notice to Harper that

the preponderance of credible evidence demonstrates both specific instances and a pattern of conduct by you that had the effect of creating an intimidating, hostile, and offensive working environment for a number of the Commission's female employees during the time they were assigned to work under your direct supervision.

*Id.* at 2. Slate found the evidence supported the conclusion that Harper's conduct was "unbecoming of an attorney for this agency and that it constituted an abuse of [Harper's] supervisory authority." *Id.* at 2. Because Slate was the individual recommending Harper's removal, he indicated he was delegating to Chairman Thomas authority to make the final decision. He also indicated Harper would again have an opportunity to examine the evidence against him and to furnish affidavits and other documentary evidence in support of his reply. He stated a written decision would be issued after Harper's ten days to respond had expired.

On December 12, 1983, Harper's counsel presented a written response to Slate's Notice. Oral argument was held on December 14, 1993, before Chairman Thomas. Although Thomas apparently concurred in the proposal to terminate Harper,[7] Harper resigned before Thomas acted on Slate's proposal. *See* First Harper Dep. at 63–78, 97–101. An EEOC memorandum to the files dated November 2, 1984, stated that after the December 14, 1983 hearing on Slate's proposed adverse action, Harper was "given the option of retiring as soon as he became eligible or having the Chairman issue his decision on the adverse action. Mr. Harper opted to retire, effective October 31, 1984." Def. Ex. G at 19, Memorandum from Cynthia C. Matthews.

Harper sued defendant WJLA–TV and its employees on one previous occasion regarding a 1983 broadcast that directly accused Harper of sexual harassment. *See Harper v. WJLA–TV Inc.*, Civ. Action No. 3312–84

---

5. *Id.* at 2–3 (footnotes omitted) (emphasis added). Slate indicated that the specifications of one woman had not been provided by her but were based on the deposition testimony of Harper himself in a previous sexual harassment lawsuit filed by EEOC employee Patsy Stewart.

Slate only relied upon the specifications of thirteen women for his proposed adverse action, since a fourteenth woman relied upon in Middleton's Notice had not provided information personally.

6. Stewart alleged that on at least one occasion, Harper had "stated that [he] would 'rather make love, not war,' while [he] leaned back in [his] chair rubbing [his] apparently erect penis." Def. Ex. G at 5.

7. Thomas stated during the 1991 Judiciary Committee hearings that he believed that his recommendation at the time "was that, for the conduct involved, [Harper] should be fired." Def. Ex. D at 1.

(D.C.Super.Ct.) (hereinafter "1986 lawsuit"). The 1983 broadcast was based on a WJLA–TV investigation of a lawsuit filed against Harper by the aforementioned Patsy Stewart. *Patsy Stewart v. EEOC,* Civ. Action No. 81–1643 (D.C.Super.Ct.).[8] The Middleton and Slate Notices relied upon by WJLA–TV in the present case were produced in discovery during the 1986 lawsuit, and the defendants there attempted to introduce the Notices to support the truth of the sexual harassment allegations in the 1983 broadcast. Judge Susan R. Holmes of the Superior Court for the District of Columbia denied the defendant's motion for summary judgment, concluding that Harper's claim raised "some question of actual malice or reckless disregard for the truth." Pl.Ex. A at 11. In her ruling, Judge Holmes determined that defendants could not introduce the Middleton Notice into evidence as an exception to the hearsay rule because the Notice was not "the result of a quasi-judicial proceeding which afford[ed] the plaintiff due process rights" and therefore was "not inherently reliable" for the purposes of the hearsay exception.[9] Judge Holmes concluded that the defendants therefore had offered "insufficient support for the defendant's claim of truth" to prevail at the summary judgment stage. *Id.* at 7. In 1986, however, a District of Columbia jury found for the WJLA–TV defendants in a trial on the truth of the sexual harassment allegations.

## II.

In the present case, plaintiff does not challenge the general allegations of sexual harassment in the October 11, 1991 broad-

casts. His challenge is limited to defendant's publication of the terms "masturbating" and "played with his genitals." *See* Memorandum in support of Plaintiff's Motion in Limine at 1. Specifically, plaintiff argues that the 1991 broadcasts "us[ed] the word 'masturbate' in a manner designed to imply, and through innuendo to suggest, that Plaintiff had sometime in the past masturbated in public in the presence of at least 13 females." Complaint ¶ 1. Plaintiff also challenges the truth of Walters' report that Harper had been "charged with sexually harassing thirteen different women." Plaintiff argues the statements were libelous *per se* and that defendants published the broadcasts with actual malice. He notes that as a result of the broadcasts, Senators Heflin and Hatch repeated plaintiff's name and the term "masturbate" during the televised confirmation hearings. *Id.* ¶ 7–8.

Defendants removed the case from the D.C. Superior Court, and this Court has jurisdiction pursuant to 28 U.S.C. § 1332. It is undisputed that District of Columbia defamation law controls. Defendants now move for summary judgment, contending that the broadcasts were privileged as fair and accurate accounts of official reports or, alternatively, that plaintiff is a public figure who has failed to demonstrate actual malice. Plaintiff opposes the motion on the merits and argues that material facts remain in dispute and that the questions of abuse of privilege and actual malice are questions for a jury, citing *White v. Fraternal Order of Police,* 909 F.2d 512 (D.C.Cir.1990).

Plaintiff, however, has not demonstrated that material facts are in dispute.[10] The

---

8. The case eventually was voluntarily dismissed by the plaintiff.

9. Pl.Ex. A at 7. Specifically, Judge Holmes found that

    [p]laintiff was not afforded any of the procedural due process rights commonly afforded even in a quasi-judicial forum. He was not permitted to confront witnesses. He was not permitted to depose witnesses. He was not permitted to cross-examine witnesses.

    Some of the documents that were submitted to the investigator, Middleton, came in the form of affidavits some of which reported hearsay. The investigator did not question any of the witnesses in person, permitted the defen-

dant an opportunity to cross examine them, but rather permitted the plaintiff in this case, the subject of the investigation in that case, to submit affidavits and to be heard orally in support of his claim that he ought not have the adverse action taken against him.

*Id.*

10. Plaintiff's statement of material facts as to which there is a genuine dispute refers only to several affidavits filed by individuals who witnessed the WJLA–TV broadcast or the statements by Senator Heflin that Harper had " 'masturbated' and or 'played with his genitals' in public in the presence of female employees." These witnesses testify that they know Harper and that

Supreme Court also has stated clearly that questions of actual malice may be determined on summary judgment motions. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), the Court stated that "when the factual dispute concerns actual malice ... the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." This circuit's Court of Appeals also has stated that "[t]here must be proof from which a reasonable jury acting reasonably could find actual malice by clear and convincing evidence before a plaintiff can survive summary judgment." [11] The accuracy of a privileged report, likewise, is subject on a motion for summary judgment to the court's determination whether "it would be unreasonable for a jury to find that the article was not a fair and accurate account." *Dowd v. Calabrese*, 589 F.Supp. 1206, 1217 (D.D.C.1984) (granting summary judgment on grounds that report was fair and accurate). The case therefore is ripe for summary judgment.

### III.

■ Plaintiff correctly contends that the October 11, 1991 broadcasts reporting that Harper masturbated in public are libelous *per se*, describing "conduct that would render him liable to punishment, or make him odious, infamous, or ridiculous." *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 697 (D.C.App.1970), *quoting Chaloner v. Washington Post Co.*, 36 App.D.C. 231, 233 (1911). Defendants argue, however, that regardless of their defamatory content, the broadcasts were based entirely on official EEOC documents and therefore were privileged as fair and accurate reports of an official govern-

ment report or proceeding. The case therefore raises the important question of what government documents constitute "official reports," media coverage of which is conditionally privileged under the District of Columbia law.

The common law long has recognized a privilege for the publication of certain official government proceedings and public meetings. Section 611 of the Restatement (Second) of Torts (1977) (hereinafter "Restatement") describes the privilege as follows:

> The publication of defamatory matter concerning another in a report of *an official action or proceeding* or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

(Emphasis added). The purpose of the privilege is to promote public scrutiny of governmental affairs. *Bell v. Associated Press*, 584 F.Supp. 128, 130 (D.D.C.1984). "[T]he privilege springs from the recognition that in a democratic society, the public has both the right and the need to know what is being done and said in government—even if some of that is defamatory." *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C.Cir.1985); *see also* Restatement § 611, Comment a (basis of privilege "is the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings").

■ Once a report is deemed "official," an accurate publication of its contents is privileged, regardless of their veracity. Thus, "the privilege encourages the media to disseminate official records—whether verbatim or in fair summaries—without fear of liability for any false, defamatory material that they might contain." *Dameron*, 779 F.2d at 739,

they were "shocked and astonished and did not believe those telecasts." Affidavits of Lamont White, Gwendolyn Reams, Valerie Bailey, and James Cooks. These affidavits proffer no probative evidence and therefore place no material facts in dispute.

11. *Nader v. de Toledano*, 408 A.2d 31, 49 (D.C.App.1979). Summary judgment is particularly appropriate in the First Amendment context, where speedy resolution of litigation may be

necessary to prevent the chilling of public speech. *Id.* at 43, *citing Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C.Cir.1966). *But see Hutchinson v. Proxmire*, 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411 (1979) (" 'actual malice' calls a defendant's state of mind into question ... and does not readily lend itself to summary disposition") (citation omitted).

*citing Bufalino v. Associated Press,* 692 F.2d 266, 271 (2d Cir.1982). It protects the publisher "even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false." Restatement § 611 Comment a. The privilege accordingly reflects the First Amendment's acknowledged "bias toward unfettered speech at the expense of compensation for harm to reputation." *Nader,* 408 A.2d at 39, *quoting Buckley v. Littell,* 539 F.2d 882, 889 (2d Cir.1976).

■ The fair reporting privilege will fail, however, if the publication is not fair and accurate or if it is not attributed to the official source. *E.g., Dameron,* 779 F.2d at 739; *Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 89 (D.C.App.1980). The privilege also is waived if the report was published with actual malice. *Johnson,* 271 A.2d at 698.

Originally, the District of Columbia adopted a narrower rule for the fair reporting privilege than that in the Restatement. Early cases on the privilege expressed doubt whether it extended beyond judicial proceedings to executive and legislative actions, and whether, with respect to even judicial proceedings, some "official act" by the court was necessary in order for the privilege to apply. *Phillips,* 424 A.2d at 88. The doctrine since has been expanded, however, to non-judicial proceedings, *id.* at 89, and now encompasses "a report of any official proceeding or any meeting open to the public which deals with matters of public concern." *Id.* at 88. This includes:

> reports of proceedings before any court, or agency of the court (e.g. a grand jury returning an indictment), reports of any other proceedings, judicial in character, which take place before administrative, executive or legislative bodies ... and to reports of action by legislative bodies and reports of bodies which are by law authorized to perform public duties (e.g. bar

association disciplinary proceedings), as well as *reports of any official proceeding or action taken by any officer or agency of government.*

*Id.*

The District now has adopted the minority rule that pleadings filed in judicial proceedings qualify as official records under the privilege even before any official judicial action is taken. In *Johnson v. Johnson Publishing Co.,* 271 A.2d 696 (D.C.App.1970), for example, the D.C. Court of Appeals upheld as privileged a magazine report stating that a husband had beaten his family and that the wife had sought divorce on the grounds of cruelty. The article was based on a complaint filed in a divorce proceeding. The court concluded that the privilege could be asserted for reports of charges made in formal pleadings, even prior to any judicial action, since "the filing of a pleading is a public and official act in the course of judicial proceedings." *Id.* at 698, *citing Campbell v. New York Evening Post,* 245 N.Y. 320, 157 N.E. 153 (1927). The court preferred this conclusion despite the acknowledged risk "that groundless suits may be filed and immediately dismissed after the defamatory allegations have been given wide circulation." *Johnson,* 271 A.2d at 698.

Because the underlying purpose of the privilege is to encourage "the dissemination of fair and accurate reports," *Dameron v. Washington Magazine, Inc.,* 779 F.2d 736 (D.C.Cir.1985), local and federal courts in the District of Columbia have established standards for ensuring that only fair representations of government proceedings are protected. This emphasis on fairness and accuracy suggests that some form of reliability must be required of the underlying "official" government document or proceeding as well. Important interests of personal privacy also counsel in favor of requiring some degree of reliability in the underlying document before a report will be deemed privileged.[12] How-

---

12. The harm that abuse of the privilege may inflict is, of course, obvious. *See, e.g., Coleman v. Newark Morning Ledger Co.,* 29 N.J. 357, 149 A.2d 193 (1959) (newspaper report of Senator McCarthy's summary of secret Congressional hearings which defamed previously unknown

serviceman deemed privileged); *see also* Pedrick, *Senator McCarthy and the Law of Libel: A Study of Two Campaign Speeches,* 48 Nw.U.L.Rev. 135 (1953) (arguing for limitation of fair reporting privilege in light of McCarthy excesses) *cited in*

ever, while courts have focused on the accuracy with which information must be publicized, very few have addressed the question raised in this case of what reliability, if any, is required of the underlying official document or proceeding.

Section 611 of the Restatement offers little guidance on this question. The Restatement simply establishes that the privilege extends to "the report of any official proceeding, or any action taken by any officer or agency of the government," and that "[t]he filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege." Restatement § 611, Comment d.

Few District of Columbia courts have addressed the issue of what executive or legislative actions constitute official records for the purposes of the privilege. In *Phillips*, the D.C. Court of Appeals concluded that a police log recording oral communications from a police "hot line" did not constitute an official record. The log report, according to the court, merely constituted an unofficial "hearsay statement by police of facts of a case." 424 A.2d at 89. The court also noted that the log was compiled as a "joint venture" for the benefit of the media, and therefore held that it did "not carry the dignity and authoritative weight as a record for which the common law sought to provide a reporting privilege." *Id.* The defendant newspaper's demonstrably false statements made in reliance on the hot line report thus were not privileged.

The *Phillips* court contrasted such unofficial statements by the police, complainants, attorneys, or other witnesses regarding the facts of a case, which were not privileged, with "[a]n arrest by an officer ... a report of the fact of that arrest, or of the charge made by the officer," which fall within the conditional privilege. *Id., citing* Restatement (Second) of Torts § 611, comment h (Tent.

Draft No. 20, 1974); *see also Piracci v. Hearst Corp.*, 263 F.Supp. 511 (D.Md.1966) (police arrest docket and log book considered official public records; report based on them held privileged); *Bell v. Associated Press*, 584 F.Supp. 128 (D.D.C.1984).

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C.Cir.1990), also held privileged a news report regarding a police investigation into corruption of the police department's drug testing system. The police investigation itself had been prompted by two letters written by police department employees alleging abuse of the testing system. The plaintiff in *White* contended that the news report had been based on the underlying letters rather than on the police commission's report, and that the letters were not official proceedings entitling the defendants to the privilege. The court rejected that argument, concluding "it would be untenable to make a distinction between a report about an official proceeding and that which, for all purposes, is the subject matter of the proceeding." 909 F.2d at 527. The *White* court also concluded that a government committee's investigation need not be open to the public in order for a report on the proceeding to be privileged. 909 F.2d at 527, *citing Medico v. Time Inc.*, 643 F.2d 134 (3d Cir. 1981) (privilege applied to non-public FBI reports).

The Third Circuit *Medico* case, 643 F.2d at 137–141, relied upon by the D.C. Circuit in *White*, addressed issues close to those raised here. *Medico* involved a magazine report based on confidential FBI documents regarding a criminal investigation.[13] The court rejected plaintiff's argument that the documents should not be deemed "official" because they expressed only tentative and preliminary conclusions that the FBI had not adopted as accurate.[14] Despite the fact that no official action had been taken on the criminal investigation, the court refused to analo-

*Medico v. Time, Inc.*, 643 F.2d 134, 143 n. 30 (3d Cir.1981).

**13.** The information in the FBI documents was based on a transcript of an electronic wiretap. The release of the documents to the news organization apparently was unauthorized.

**14.** The title page of one of the documents bore the notice: "This document contains neither recommendations nor conclusions of the FBI." *Medico*, 643 F.2d at 139. The district court previously had held that the fact that the documents were not public did not remove their privileged status, and this ruling was not challenged on appeal.

gize the documents to "statements made by the police or by the complainant or other witnesses" that are not part of an arrest itself and therefore are not privileged. *Medico*, 643 F.2d at 139, *quoting* Restatement § 611, Comment h. The court instead held that the documents were "at least as 'official'" as other documents protected by the privilege under Pennsylvania law. *Id.* at 140.

■ Turning to the present case, plaintiff asserts two primary claims in the present case. He first points to *White* to argue that the fair reporting privilege only applies if the official documents relied upon are "materially true accounts of what transpired." 909 F.2d at 518. As stated previously, however, the District of Columbia does not require that the information in the official report be true in order for the privilege to apply. "[T]he point of the privilege is that it covers the reporting of both true and false factual matters." *Bell*, 584 F.Supp. at 130;[15] *see also Phillips*, 424 A.2d at 88 ("Misstatements of fact as well as opinion are protected under this reporting privilege.") The report simply must be official, and the publication must be attributed, fair and accurate. Plaintiff's argument that an official document's contents must be true in order for a report about the document to be privileged therefore misstates the law.

Plaintiff next argues that because the Middleton Notice was determined by Judge Holmes in the previous case to be "not inherently reliable" for the purposes of the hearsay rule, the EEOC Notices cannot be considered "official" documents, and the fair reporting privilege does not apply. As Judge Holmes noted in ruling on its admissibility, the allegations in the Middleton Notice were not subject to cross-examination and plaintiff did not have an opportunity to depose or otherwise confront witnesses. Some of the affidavits on which the Middleton Notice relied reported hearsay, and none of the witnesses were questioned in person. Furthermore, both Notices proposed adverse actions, rather than expressing a final agency decision. The present record contains no evidence of the final decision Chairman Thomas would have issued concerning the Slate proposal, other than Thomas' sworn statement, years later before the Senate Judiciary Committee, that he had believed Harper should be fired. Defendant therefore argues that since the documents were not "the result of a quasi-judicial proceeding which affords the plaintiff due process rights," they were not reliable enough to constitute "official" documents upon which a privileged report may be based.

The case law in this and other districts does require some form of reliability of underlying government documents, as previously discussed. No support exists, however, for plaintiff's contention that the fair reporting privilege requires the same degree of reliability as that required to establish that a document is "inherently reliable" under the hearsay rule. The two rules are unrelated. In fact, the reliability (established through quasi-judicial due process) required for hearsay purposes must be substantially more rigorous, since a statement admitted as an exception to the hearsay rule is admitted for the truth of its content. No such assumption of veracity applies to official government documents under the fair reporting privilege, where the purpose is not to establish truth but simply to disseminate information about government proceedings.

Moreover, the Middleton and Slate Notices reasonably may be considered official documents. Both are formal Notices of Adverse Action prepared by the Office of General Counsel of the EEOC, specifying particular acts of sexual harassment by plaintiff against several identified complainants, forming a pattern of sexual harassment. Both Notices were based upon extensive personal statements by the women concerned and, in one case, upon the deposition testimony of Harper himself. Harper twice was afforded an opportunity to examine the evidence against him and to present affidavits and other documentary evidence in rebuttal, as well as a written answer. He twice presented oral arguments through counsel in hearings be-

---

15. *White*, 909 F.2d at 518, did not hold to the contrary. Although the plaintiff in that case conceded that "the information published in the FOP letters and provided in the news reports was true," the court nowhere suggested veracity was required for the privilege to apply.

fore the General Counsel or Chairman Thomas. Thomas concurred in the proposal to transfer and demote Harper, rendering that proposal final as well as the fact finding that may fairly be inferred to have supported that conclusion. Thomas since has testified under oath that he concurred in Slate's proposal to fire Harper as well.

In light of the above, the Notices at least meet the threshold of reliability required in this jurisdiction. The Notices did not contain mere unofficial hearsay statements by individual officials, as did the police hot line log rejected in *Phillips*. The allegations in the Notices were at least as reliable, if not more so, than the charges in a complaint filed in a civil case,[16] charges made in connection with a grand jury proceeding, *Phillips*, 424 A.2d at 88, or statements in an official police arrest log, *Bell*, 584 F.Supp. 128, all of which are accepted as official reports under District of Columbia law.

I therefore find that the official EEOC Notices of Adverse Action constituted "reports of any official proceeding or action taken by any officer or agency of government" *Phillips*, 424 A.2d at 88, for the purposes of the fair and accurate reporting privilege. I am satisfied that treating the broadcasts as privileged serves the overriding purpose of the privilege "that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed." *Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884) (Holmes, J.).

### IV.

■ Having established that the EEOC Notices qualify as official reports, the question remains whether the broadcasts were complete and accurate representations of the Notices.[17] Plaintiff does not explicitly raise

the question of fair and accurate reporting to argue that the privilege does not apply. He instead points to alleged inaccuracies in the broadcasts as evidence of defendants' malice. Because a report of a government proceeding must be fair and accurate in order to be privileged, however, it is necessary to examine the broadcasts under this standard.

In order for accounts of official proceedings to enjoy the privilege, according to the Restatement, a journalistic report must convey to readers "a substantially correct account of the proceedings." Restatement § 611, Comment f. The publication must not be "so edited and deleted as to misrepresent the proceeding and thus be misleading." *Id.* While the report need not be exhaustive, "it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it." *Id.* Under D.C. law, this rule has been interpreted to establish that the privilege does not apply if the defamatory report is "garbled or fragmentary to the point where a false imputation is made about the plaintiff which would not be present had a full and accurate report been made" or if the report of the official proceeding is "otherwise unfair or inaccurate." *Dameron*, 779 F.2d at 739 (citations omitted).

Plaintiff challenges defendants' broadcasts on three levels: first, that the use of the term "masturbating" was libelous *per se*, second, that the broadcasts wrongfully implied that plaintiff had masturbated in front of at least 13 females, and third, that the report that thirteen women had charged plaintiff with sexual harassment was inaccurate.

The first two of these contentions may be dismissed summarily. Both the Middleton and Slate Notices reported specifications by two or three identified women that Harper

---

16. *See Johnson*, 271 A.2d 696. In holding that confidential, preliminary FBI documents fell within the privilege in *Medico*, the Third Circuit also noted:

FBI files seem at least as "official" as the pleadings in civil cases. Although civil complaints are instituted, for the most part, by private parties, the FBI documents concerning Medico were compiled by government agents acting in their official capacities. Moreover, the danger that a civil litigant will willfully

insert defamatory assertions in his complaint generally would appear at least as great as the risk that a criminal investigatory agency will knowingly include false or malicious statements in its files.

643 F.2d at 140.

17. The broadcasts explicitly cited the EEOC documents as the basis for the reports. Thus, the requirement of attribution has been satisfied and has not been challenged in this Court.

had rubbed or played with his genitals in their presence. According to the Notices, one woman explicitly stated she believed Harper was masturbating. Defendants' broadcasts merely related that the allegations against Harper in the documents included claims that Harper had "played with his genitals on two occasions in front of two separate women." Def. Ex. C at 3. The broadcasts also showed a copy of one of the EEOC documents, with the words "masturbating" and "played with your genitalia" highlighted. Furthermore, although the broadcasts repeatedly referred to "thirteen women," the broadcasts did not state, and may not fairly be interpreted to imply, that more than two women had reported incidents of masturbation. In fact, the broadcasts explicitly were to the contrary. None of these statements by defendants, therefore, deviates from the underlying EEOC documents or could be construed as other than a fair and accurate report.

Plaintiff's most persuasive challenge to the broadcasts' accuracy is that the broadcasts mischaracterized the number of women raising allegations and the nature of the claims against him. In particular, Harper contends that the statement that Harper had been "*charged* with sexually harassing thirteen different women," Def. Ex. C at 2, is misleading, since only one legal action ever was filed against him. *See* Memorandum in support of Plaintiff's Motion in Limine at 1. Nothing in the published broadcasts, however, suggests that the term "charged" was used to imply that thirteen legal claims had been filed against Harper. This conclusion is supported by other statements in the broadcasts that "[t]hirteen women *say* Earl Harper harassed them," Def. Ex. C at 2, that "thirteen women *complained* they had been harassed by Earl Harper," *id.* at 3, and that "thirteen women *alleged* Earl Harper sexually harassed them." [18] (Emphasis added).

Harper also suggests that the WJLA–TV broadcasts misconstrued the Notices by referring to 13 women, when in fact Slate himself had acknowledged that six of the

women's claims did "not actually constitute sexual harassment." Pl.Ex. G at 3. Here again, however, the evidence is insufficient for a reasonable jury to find that the report was not fair and accurate. The Middleton Notice recommending Harper's transfer, in which Chairman Thomas ultimately concurred, cited the specifications of 14 women without distinguishing among them. Middleton concluded that the specifications comprised "a pattern of conduct on [Harper's] part which has created an intimidating, hostile and offensive working environment characterized by a sexually harassing atmosphere." Def. Ex. F at 4.

The Slate Notice also identified claims of 13 women that Harper had "either sexually harassed them, had a romantic or sexual relationship with them" or otherwise made them "wary of possible advances of a sexual nature by [him]." Pl.Ex. G at 3. Although concluding that six of the thirteen cases he examined did not themselves constitute sexual harassment, Slate nevertheless included those cases in his deliberations as well. Nothing in the broadcasts was deleted, "garbled or fragmentary to the point where a false imputation" about the Notices could be made. *Dameron,* 779 F.2d at 739. In light of the detailed specifications included in both EEOC reports, and the conclusions reached by both Middleton and Slate, a reasonable jury could only conclude that "taken as a whole," defendants' broadcasts were "a fair and substantially correct repetition of these allegations and thus privileged." *Johnson,* 271 A.2d at 698; *citing Washington Times Co. v. Hines,* 5 F.2d 541 (D.C.Cir.1925).

### V.

Plaintiff finally argues that even if the broadcasts were privileged, defendants waived the privilege by publishing the information with actual malice—"that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S.

---

18. Def. Ex. D at 1. The Court notes that Webster's Third New International Dictionary (unabridged) 377 (1971) defines the term "charge," *inter alia,* as follows: 3 a: to bring an accusation against: call to account: BLAME ... b: to make an assertion against esp. by ascribing guilt or blame for an offense or wrong: ACCUSE.

254, 280, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964).

■ The burden of proving actual malice is a heavy one, requiring the plaintiff to demonstrate "that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement" against a standard of *clear and convincing* evidence. *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984). This necessitates more than a breach of ordinary care. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Nader,* 408 A.2d at 41.

■ Mere omission of certain facts in itself does not constitute evidence of actual malice, absent a demonstration that the defendant knew or believed the omission rendered the remaining report false. *Time Inc. v. Pape,* 401 U.S. 279, 289–92, 91 S.Ct. 633, 639–41, 28 L.Ed.2d 45 (1971). Defects in an investigation also are not evidence of malice unless there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Sullivan,* 376 U.S. at 278–88, 84 S.Ct. at 724–30.

Because "the inquiry involved in a ruling on a motion for summary judgment ... necessarily implicates the substantive evidentiary standard of proof that would apply at the trial," *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512, plaintiff at this summary judgment stage bears the burden of establishing that the evidence is of sufficient "caliber or quality to allow a rational finder of fact to find actual malice by *clear and convincing* evidence." *Id.* at 254, 106 S.Ct. at 2513 (emphasis added).

Plaintiff has failed to meet this burden. Plaintiff appears to rely, for his primary evidence of malice, upon Judge Holmes' exclusion of the Middleton Notice as hearsay in the unrelated 1986 case. Plaintiff attempts to argue that Judge Holmes found the Notice

"inherently unreliable," *e.g.,* Pl.Mem. at 13, and that defendants' knowing publication of an unreliable document is evidence of actual malice. Plaintiff misconstrues Judge Holmes' conclusion, however, and misstates its import. Nowhere in her opinion did Judge Holmes find the Notice "inherently unreliable." As previously discussed, she simply concluded that the Notice was "not inherently *reliable*" for the purposes of the hearsay rule. Defendants' knowledge of this holding is not evidence that defendants "entertained serious doubt as to the truth" of their broadcasts. Harper's reliance on Judge Holmes' suggestion in the 1986 case that WJLA–TV might have been reckless in broadcasting that unrelated report also is misplaced. This conclusion is particularly appropriate in light of the fact that WJLA–TV ultimately prevailed in that case in a jury trial on the merits.

Plaintiff next points to Slate's opinion that only seven of the women's allegations constituted harassment to argue that defendants knew the broadcasts were inaccurate. This argument already has been rejected. Because Slate himself relied upon all 13 women's allegations in his deliberations, defendants' mere publication of that reliance cannot constitute evidence of actual malice.

As evidence to contravene the Slate and Middleton Notices, plaintiff offers what he describes as an unsolicited letter signed by 11 co-workers protesting his proposed removal. Pl.Ex. D. He also submits a copy of an outstanding performance appraisal dated 1975, eight years before the EEOC investigation, Pl.Ex. E, and letters from the Assistant General Counsel of the Atlanta office dated 1976. None of this, however, poses a material fact in dispute or constitutes evidence of malice.

Plaintiff finally attempts to suggest that defendants maliciously aired a "sensational" report in order to boost their ratings during the annual rating period. Defendant Walters has testified in deposition, however, that the broadcasts were not prepared during a ratings period. Def. Ex. A, Deposition of Del Walters, at 62–63. Moreover, it is apparent from the face of the broadcasts that they were prepared to coincide with the Thomas

confirmation hearings and that their primary target was Thomas, not Harper. It can hardly be questioned that the subject of the broadcasts was one of extreme public concern at the time they were aired.

Finally, the record contains no evidence that defendants knew the EEOC reports were false or entertained serious doubts as to their truth. *See* Walters Dep. at 55; Def. Ex. B, Deposition of Gary C. Wordlaw, at 22, 24–25. The broadcasts were based directly on two EEOC reports, one of which explicitly was concurred in by the EEOC Chairman. Walters has testified that in investigating the reports, he thoroughly reviewed the previous 1986 defamation lawsuit, Def. Ex. A at 51–52, 55–58, verified the authenticity of the EEOC Notices, *id.* at 92, spoke to one of Harper's former supervisors, *id.* at 61, and attempted to contact the witnesses named in the Slate Notice, reaching some of them. *Id.* at 59–60. As he stated in the 6:00 p.m. broadcast, Walters also tried repeatedly to contact Harper himself. *Id.* at 59; Def. Ex. C at 7.

Even considering all of the evidence above and the reasonable inferences therefrom in the light most favorable to plaintiff, *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), plaintiff has failed to offer evidence, much less clear and convincing evidence, on which a reasonable jury could base a finding of reckless conduct or malice. I therefore find that defendants did not waive their conditional privilege and that the broadcasts are protected against plaintiff's defamation claim as fair and accurate reports.[19] The accompanying Order accordingly grants summary judgment for defendants.

## ORDER

For the reasons stated in an accompanying Memorandum, it is this 27th day of May, 1993, hereby

ORDERED: that Defendants' Motion for Summary Judgment should be, and is hereby, GRANTED; and it is further

19. Because the fair reporting privilege is dispositive, it is not necessary to reach the question, raised by defendants in the alternative, whether

ORDERED: that the Complaint is hereby DISMISSED.

Harper is a public figure who can only be defamed with actual malice.