20-1304-cv
*Kinsey v. New York Times Co.*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2020

No. 20-1304-cv

GWYNN X. KINSEY, JR.,
*Plaintiff-Appellant*,

v.

THE NEW YORK TIMES COMPANY,
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: OCTOBER 30, 2020
DECIDED: MARCH 15, 2021

Before: LIVINGSTON, *Chief Judge*, CABRANES and LYNCH, *Circuit Judges*.

This case presents two questions: (1) whether the District Court was correct to apply New York law to the instant dispute, and (2) whether Kinsey's Complaint was properly dismissed under the fair report privilege. We answer both in the affirmative and **AFFIRM** the judgment of the District Court dismissing the Complaint.

---

BARRY COBURN, Coburn & Greenbaum, PLLC, Washington, D.C., *for Plaintiff-Appellant*.

DANA R. GREEN (David E. McCraw and Alexandra Perloff-Giles, *on the brief*), The New York Times Company, New York, NY, *for Defendant-Appellee.*

---

JOSÉ A. CABRANES, *Circuit Judge*:

This case presents two questions: first, whether the choice of New York law by the United States District Court for the Southern District of New York (Vernon S. Broderick, *Judge*) was proper, and

second, whether the District Court properly dismissed the Complaint under New York's fair report privilege. On the record before us, we answer both in the affirmative. The District Court performed the proper choice-of-law analysis, applying New York law to the conflict. It correctly reasoned that New York was the state with the most significant interests in the litigation and applied New York's fair report privilege. The District Court then properly dismissed Kinsey's Complaint as barred by the fair report privilege because the alleged defamatory statement was attributed to an official proceeding. Accordingly, we **AFFIRM** the judgment of the District Court.

## I. BACKGROUND

In reviewing a district court's grant of a motion to dismiss, we must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor."[1] For motion to dismiss

---

[1] *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015).

3

purposes, the complaint is deemed "to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."[2] We construe the following facts in the light most favorable to Kinsey.

As set forth in the Complaint, Plaintiff-Appellant Gwynn X. Kinsey, Jr. worked at the U.S. Department of Justice's Capital Case Section ("CCS") from September 1998 to October 2017. In 2016, he was promoted to Principal Deputy Chief of CCS. One year later, on May 24, 2017, Kinsey attended a happy hour with his CCS colleagues at Proper 21, a bar located in the District of Columbia. There, he had sexual contact with Alyssa tenBroek, a female CCS intern who had joined CCS in November 2015 and reported to Kinsey until she was reassigned to another deputy chief of the CCS in July 2016. Following

---

[2] *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

4

the happy hour incident, the Justice Department reassigned Kinsey to its Office of Enforcement Operations.

The following year, on March 31, 2018, The New York Times (the "Times") published an article in print and online, "At the Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping" (online), and "Justice Dept. Is Facing Claims of Gender Bias, Favoritism and Groping," (print), authored by Katie Benner. The article details a Times investigation into a series of complaints about the former Chief of the CCS, Kevin Carwile, "including complaints that he promoted gender bias and a sexualized environment," and it refers to "court records, internal documents and interviews with more than a half-dozen current and former employees."[3] Many of these records are derived from an E.E.O.C. complaint and a sex discrimination and retaliation suit filed against

---

[3] Joint App'x 22 (internal quotation marks omitted).

Carwile and the Justice Department by Jacabed Rodriguez-Coss, a former attorney in the CCS. As the article notes, "[s]even men and women from [the CCS] filed declarations" in support of her suit.[4] Benner quotes these declarations throughout the article, including the declaration of another CCS intern, Luke Woolman (the "Woolman declaration"), which describes the incident at the Proper 21 happy hour. The article described the contents of the Woolman declaration as follows: "'Mr. Kinsey, who is a married man, began to take what seemed very clearly to be unwelcome liberties of a physical, sexual nature,' Luke Woolman, an intern at the time, wrote in his declaration."[5] The online version of the article also included images depicting several paragraphs of the Woolman declaration with the

---

[4] Joint App'x 25.

[5] Joint App'x 27.

caption, "A portion of the declaration by Luke Woolman, an intern at the time in the death penalty division."[6]

While Kinsey does not deny that he had sexual contact with tenBroek at the happy hour, he filed a Complaint against the Times on January 2, 2019, alleging that the quoted language from the Woolman declaration that the contact between Kinsey and tenBroek was "unwelcome" was defamatory. Kinsey then filed an Amended Complaint on February 28, 2019, alleging that the language from the Woolman declaration was false and defamatory *per se* and that the fair report privilege did not apply. On March 7, 2019, the Times moved to dismiss Kinsey's defamation claim pursuant to Federal Rule of Civil Procedure 12(b)(6). On March 23, 2020, the District Court granted the Times' motion to dismiss, finding that the alleged defamatory statement in the article was protected by New York's fair report

---

[6] Joint App'x 28, 42.

privilege. Judgment entered the following day and Kinsey timely appealed.

## II. DISCUSSION

We review *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6), accepting as true the factual allegations in the complaint and drawing all inferences in the plaintiff's favor.[7] "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[8] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

---

[7] *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010).

[8] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

the reasonable inference that the defendant is liable for the misconduct alleged."[9]

## A. Choice of Law

On appeal, Kinsey argues that the District Court erred in applying New York's fair report privilege to the instant dispute. Instead, he argues that the District Court should have applied the law of the District of Columbia because it "has a closer connection to the underlying facts and to the Plaintiff than does New York."[10] We disagree.

"A federal court sitting in diversity applies the choice-of-law rules of the forum state."[11] Because our subject matter jurisdiction rests on diversity of citizenship, and because we are reviewing an appeal

---

[9] *Id.*

[10] Plaintiff's Br. at 15.

[11] *Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

from a federal trial court in New York, we apply New York's choice-of-law rules to determine the body of substantive law that applies.

Under New York choice-of-law rules, "the first step in any choice of law inquiry is to determine whether there is an 'actual conflict'" between the rules of the relevant jurisdictions.[12] New York Civil Rights Law Section 74 creates a privilege "for the publication of a fair and true report of any judicial proceeding."[13] This "privilege is absolute and is not defeated by allegations of malice or bad faith."[14] By contrast, the District of Columbia fair report privilege is qualified and

---

[12] *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 419-20 (2d Cir. 2001) (citing *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993)).

[13] N.Y. CIV. RIGHTS LAW § 74.

[14] *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009) (citing *Pelayo v. Celle*, 705 N.Y.S.2d 282 (2d Dep't 2000)). Notably, neither party asks this Court to apply the law of Maryland, Kinsey's domicile. In any event, Maryland has also "adopted the modern view regarding the fair reporting privilege, which discards the search for malice, and simply requires that the report be fair and substantially correct." *Piscatelli v. Van Smith*, 424 Md. 294, 309-10 & n.3 (2012) (internal quotation marks omitted).

may be "waived if the report was published with actual malice."[15]

Accordingly, we hold that there is indeed an actual conflict.

Having established that a conflict exists, we apply New York

choice-of-law rules to decide which jurisdiction's substantive law

controls. In tort cases, New York "applies the law of the state with the

most significant interest in the litigation."[16] In deciding how to weigh

interests, New York distinguishes between conduct-regulating rules

and loss-allocating rules.[17] As relevant here, a rule that governs

defamatory or libelous conduct can be considered conduct-

regulating.[18] When conduct-regulating rules conflict, New York law

---

[15] *Harper v. Walters*, 822 F. Supp. 817, 824 (D.D.C. 1993) (citing *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 698 (D.C. App. 1970)).

[16] *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999) (citing *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521 (1994)).

[17] *See Sheldon v. PHH Corp.*, 135 F.3d 848, 853 (2d Cir. 1998) (citing *Padula*, 84 N.Y.2d at 522).

[18] *See AroChem Intern., Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992) (concluding that the judicial-proceeding privilege is a conduct-regulating rule for purposes of choice-of-law analysis in a defamation action).

usually applies the traditional law of the place of the tort ("*lex loci delicti*").[19] Specifically, "[u]nder New York choice-of-law rules in defamation cases the state of the plaintiff's domicile will usually have the most significant relationship to the case, and its law will therefore govern."[20] But not always.

"[I]n multistate defamation cases, the state with the most significant relationship is not necessarily readily apparent. Thus, in cases where an allegedly defamatory statement is published nationally, there is only a presumptive rule that the law of [the] plaintiff's domicile applies, which does not hold true . . . if with respect to the particular issue, some other state has a more significant

---

[19] *Lee*, 166 F.3d at 545. These traditional rules were compiled in the original Restatement of Conflict of Laws published in 1934 and embodied the "vested rights" theory of its Reporter, Professor Joseph H. Beale of the Harvard Law School. *See generally* 1-3 JOSEPH H. BEALE, A TREATISE ON THE CONFLICT OF LAWS (1935). Beale's formalist approach emphasized territorialism—the answer to any conflict-of-law question was simply the locus of the "last act" needed to complete the cause of action.

[20] *Lee*, 166 F.3d at 545 (internal quotation marks omitted).

relationship to the issue or the parties."[21] As the Times article was

published nationally, we thus proceed to examine whether another

state has a more significant relationship to the issue or the parties.

In considering whether another jurisdiction, such as the District

of Columbia, has a more significant relationship to the case, New York

courts will "weigh all the factors that might impact on the interests of

---

[21] *Catalanello v. Kramer*, 18 F. Supp. 3d 504, 512 (S.D.N.Y. 2014) (Paul A. Engelmayer, J.) (internal quotation marks and citation omitted). New York's approach to multistate defamation cases reflects what is sometimes described as a more "modern" approach to conflict of laws that emphasizes "governmental interest analysis" and is reflected in the Restatement (Second) of Conflict of Laws, compiled in 1971. This "modern" approach was famously advanced by the legal realist movement, including especially Professor Brainerd Currie of Duke University Law School, who criticized the original Restatement's "metaphysical apparatus" which "operate[d] to nullify state interests." Brainard Currie, *Notes on Methods and Objectives in the Conflict of Laws*, 1959 DUKE L. J. 171, 174-75. In recent years, as the American Law Institute continues to draft a Restatement (Third) of Conflict of Laws, this "modern" approach has also faced criticism. *See, e.g.*, Lea Brilmayer & Charlie Seidell, *Jurisdictional Realism: Where Modern Theories of Choice of Law Went Wrong, and What Can Be Done to Fix Them*, 86 U. CHI. L. REV. 2031 (2019); *see also* Lea Brilmayer, *Interest Analysis and the Myth of Legislative Intent*, 78 MICH. L. REV. 392 (1980) (an effort to forestall jurisprudential evolution, warning that much of modern choice of law jurisprudence is "a remedy every bit as distressing as the disease it was designed to cure"); Lea Brilmayer, *The Choice of Law Revolution in Connecticut*, 62 CONN. B.J. 373 (1988) (urging caution in abandoning *lex loci* in the Connecticut state judicial system in particular). We need not enter into this debate here and only apply the conflict of law rules prescribed by the State of New York.

various states in the litigation . . . includ[ing,] where [the] plaintiff suffered the greatest injury; where the statements emanated and were broadcast; where the activities to which the allegedly defamatory statements refer took place; and the policy interests of the states whose law might apply."[22]

Kinsey argues for the application of District of Columbia law because the Woolman declaration refers to events that took place at a bar in the District of Columbia and that adversely affected his

---

[22] *Condit v. Dunne*, 317 F. Supp. 2d 344, 353-54 (S.D.N.Y. 2004) (Peter K. Leisure, J.) (internal citations omitted). A slightly different formulation of this test examines nine factors that are "particularly relevant to choice of law in multistate actions for libel": (1) the state of plaintiff's domicile; (2) the state of the plaintiff's principal activity to which the alleged defamation relates; (3) the state where the plaintiff suffered the greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where the defendant's main publishing office is located; (6) the state of principal circulation; (7) the place of emanation; (8) the state where the libel was first seen; and (9) the law of the forum. *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1091 (S.D.N.Y. 1984) (citing *Polmisano v. News Syndicate Co.*, 130 F. Supp. 17 (S.D.N.Y. 1955) (Irving R. Kaufman, J.)). But "this nine-factor test has not been adopted explicitly by the Court of Appeals as reflecting New York law, and other district courts have noted that it has not received favorable use among recent New York decisions." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Savino*, No. 06-CV-868, 2007 WL 895767, at *7 (S.D.N.Y. Mar. 23, 2007) (Loretta A. Preska, J.).

employment in the District of Columbia.[23] We also note that Kinsey was not domiciled in the District of Columbia—he lived in Maryland—and, as New York law recognizes, a "plaintiff's home state is where a plaintiff's reputation is most likely damaged."[24] As this analysis exemplifies, in multistate defamation cases such as this one, "the tort essentially lacks a locus, but rather injures plaintiff everywhere at once."[25]

Despite the fact that Kinsey lived in Maryland, and that the incident took place in his city of employment, the District of Columbia, our application of the above-listed four factors leads us to conclude that the District Court correctly decided that New York is the jurisdiction with the most significant interest in the litigation. As its

---

[23] Kinsey was reassigned to the Office of Enforcement Operations on October 21, 2017—prior to the publication of the Times article several months later.

[24] *La Luna Enterprises, Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 388 (S.D.N.Y. 1999) (Robert L. Carter, J.).

[25] *Condit*, 317 F. Supp. 2d at 353.

name suggests, the Times is domiciled in New York and the alleged defamatory statement emanated from New York.[26] Moreover, while Maryland has an interest in protecting its citizens from defamatory conduct, New York has strong policy interests in regulating the conduct of its citizens and its media.[27] The above-listed factors

---

[26] *See, e.g.*, *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, No. 06-CV-11407, 2007 WL 4820968, at *5 (S.D.N.Y. Sept. 18, 2007) ("[T]he allegedly defamatory article emanated from New York via its publication in the Post.").

[27] *See, e.g.*, *Machleder v. Diaz*, 801 F.2d 46, 52 (2d Cir. 1986) ("CBS accurately asserts that New York has a strong interest in this litigation, because WCBS–TV is located there, the subject broadcast emanated in Manhattan, and the day-to-day professional activities of CBS are conducted in New York."); *Test Masters Educ. Servs.*, 2007 WL 4820968, at *5 ("New York has a policy interest in regulating the conduct of the media, including the Post whose principal place of business is in New York." (internal citation omitted)); *Condit*, 317 F. Supp. 2d at 353 ("New York . . . has an interest in regulating the conduct of its media. This interest remains even when the target of the statement lives in another state." (internal citation omitted)).

16

therefore weigh in favor of applying New York's fair report privilege to the instant dispute.

### B.  Fair Report Privilege

The Times argues that its publication of the alleged defamatory statement in the Woolman declaration is privileged under New York's fair report privilege. We agree.

New York Consolidated Laws, Civil Rights Law Section 74 provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding." A statement comes within the privilege and "is deemed a fair and true report if it is substantially accurate, that is if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth."[28] A key

---

[28] *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93 (2d Cir. 2017) (internal citations and quotation marks omitted).

17

test courts have adopted to resolve whether a report qualifies for the fair report privilege is whether "the ordinary viewer or reader" can "determine from the publication itself that the publication is reporting on [a judicial] proceeding."[29] In other words, "[i]f the context in which the statement [is] made make[s] it impossible for the ordinary viewer [or reader] to determine whether [the publication] was reporting on a judicial proceeding, the absolute privilege does not apply."[30] New York courts "adopt a liberal interpretation of the fair and true report standard of [Section] 74 so as to provide broad protection to news accounts of judicial proceedings."[31] In other words, New York courts will not review "[t]he challenged language of the headline and article

---

[29] *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 216 (N.D.N.Y. 2014).

[30] *Cholowsky v. Civiletti*, 887 N.Y.S.2d 592, 596 (2d Dep't 2009) (internal quotation marks and some alterations omitted); *see also Wenz v. Becker*, 948 F. Supp. 319, 323 (S.D.N.Y. 1996).

[31] *Friedman*, 884 F.3d at 93 (internal punctuation omitted).

. . . with a lexicographer's precision because a newspaper article and a headline is a condensed report of events."[32]

Here, the parties agree that the Woolman declaration was filed in a civil case in the District of Connecticut[33] and that the alleged defamatory language that Kinsey's conduct at the happy hour was "unwelcome" was quoted directly from that declaration. Accordingly, we are left to ask whether an "ordinary reader" would understand the excerpt from the Woolman declaration to be a report of an official proceeding. The answer is yes.

First, the Times article notes that it is reporting on a specific court proceeding and that seven declarations were filed in that proceeding.[34] Second, the article then quotes from those declarations

---

[32] *Idema v. Wager*, 120 F. Supp. 2d 361, 369 (S.D.N.Y. 2000) (quoting *Becher v. Troy Publ'g Co.*, 589 N.Y.S.2d 644, 646 (3d Dep't 1992)).

[33] *Rodriguez-Coss v. Lynch*, No. 16-CV-006333 (D. Conn. filed April 21, 2016).

[34] "Ms. Rodriguez-Coss filed a complaint to the E.E.O.C., which notified the Justice Department. . . . She sued the department in 2016, accusing [Carwile] of

19

throughout and follows the alleged defamatory language from the Woolman declaration with the phrase, "Luke Woolman, an intern at the time, wrote in his declaration."[35] The online version of the article also includes an image of several paragraphs of the Woolman declaration with the caption, "[a] portion of the declaration by Luke Woolman, an intern at the time in the death penalty division."[36]

But Kinsey argues this was not clear enough because an ordinary reader would not be able to "determine where, if anywhere, the Woolman [d]eclaration was filed or otherwise utilized."[37] In

---

gender discrimination and claiming that her permission to work in Connecticut was taken away in retaliation for her complaints. Seven men and women from the unit filed declarations in her support." Joint App'x 25.

[35] Joint App'x 27.

[36] Joint App'x 28, 42.

[37] Plaintiff's Br. at 22. In his briefing, Kinsey also offers us a series of tables purporting to summarize the article's "references to a litany of investigations and proceedings" in an effort to demonstrate that the article is insufficiently clear about where the Woolman declaration was filed. Plaintiff's Br. at 8-10. But we do not need to proceed with a "lexicographer's precision." *Idema*, 120 F. Supp. 2d at 369 (internal quotation marks omitted). It is clear from the article itself that quoted language from the Woolman declaration is drawn from an official proceeding.

support of his argument, he quotes a decision of a federal trial court in New York, *Adelson v. Harris*, that "in order to enjoy the protection of the [fair report] privilege, the publication in issue must clearly attribute the statement in question to the official proceeding or document on which it is reporting or from which it is quoting."[38]

First, we disagree that an "ordinary reader" would be unlikely to understand that the Woolman declaration was one of the seven declarations filed in the Rodriguez-Coss proceeding referenced earlier in the article. It is clear from the context and structure of the article as a whole, which (though it references other information developed by the reporter) is organized around the declarations in that litigation that the Woolman declaration was one of those declarations.

Moreover, even if the article failed to clearly identify the specific proceeding at issue, Kinsey does not acknowledge the *Adelson* Court's

---

[38] 973 F. Supp. 2d 467, 482-83 (S.D.N.Y. 2013) (J. Paul Oetken, J.) (internal quotation marks omitted).

21

explanation that it "must be apparent *either* from specific attribution *or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings.*"[39] Indeed, our case law does not require that the court filing, the court, or the jurisdiction be specifically identified in the article.[40] The key question is whether the

---

[39] *Id*. at 482 (emphasis added) (quoting *Dameron v. Wash. Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985)). Notably, the *Adelson* Court applied the fair report privilege of Nevada, which it characterized as "essentially the same" as that of the District of Columbia. *Id.* at 482-83 & n.12. Although the District of Columbia fair report privilege differs from the New York fair report privilege in key respects, as highlighted in our choice-of-law analysis, this particular aspect of the District of Columbia fair report privilege is consistent with the New York fair report privilege's requirement that an "ordinary . . . reader must be able to determine from the publication itself that the publication is reporting on the proceeding." *Fine*, 11 F. Supp. 3d at 216; *see also Cholowsky*, 887 N.Y.S.2d at 596.

[40] Kinsey also cites *Fine v. ESPN, Inc.*, 11 F. Supp. 3d at 214-17 and *Wenz v. Becker*, 948 F. Supp. at 323, but, as noted above, both cases make clear that a party that wishes to assert the fair report privilege must make clear to its audience that it is reporting on a proceeding. "If the context in which the statements are made make it impossible for the ordinary viewer to determine whether defendant was reporting on a trial or simply from interviews and independent research, the absolute statutory privilege does not attach." *Wenz*, 948 F. Supp. at 323.

22

reader is able to determine that the report is *of a proceeding*. That much is unquestionably clear from the article.

### III. CONCLUSION

To summarize, we hold as follows:

(1) New York law controls in the instant dispute; and

(2) Kinsey's Complaint was properly dismissed as barred by the New York fair report privilege.

For the reasons stated above, we **AFFIRM** the District Court's judgment of March 24, 2020.